UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: _____ 10|8|13 _____

_Kyle Jiggetts_

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

_AlliedBarton Security Services, LLC,_

_Seiu, Local 32BJ_

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)*

AMENDED

**COMPLAINT**

Jury Trial: ☒ Yes   ☐ No
(check one)

13 CIV. 5353 (PAE)

RECEIVED
OCT  8 2013
PRO SE OFFICE

I.    **Parties in this complaint:**

A.    List your name, address and telephone number. If you are presently in custody, include your identification number and the name and address of your current place of confinement. Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff    Name _Kyle Jiggetts_
Street Address _2377 Tiebout Avenue_
County, City _Bronx_
State & Zip Code _New York 10458_
Telephone Number _1-917-631-0763_

B.    List all defendants. You should state the full name of the defendant, even if that defendant is a government agency, an organization, a corporation, or an individual. Include the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

Defendant No. 1    Name _Geraldine A. Cheverko, Esq._
_AlliedBarton Security Services LLC_
Street Address _10 Bank Street Suite 700_
_Eckert, Seamans, Cherin & Mellott, LLC_

*Rev. 05/2010*

County, City _White Plains_____

State & Zip Code _New York  10606_____

Telephone Number _(914) 286- 2817_____

**Defendant No. 2**   Name _Seiu, Local 32 BJ -Elizabeth A. Baker, ESQ._

Street Address _25 west 18th street, 5th Floor_

County, City _New York_____

State & Zip Code _NY  10011_____

Telephone Number _212 - 388- 2062_____

**Defendant No. 3**   Name _____

Street Address _____

County, City _____

State & Zip Code _____

Telephone Number _____

**Defendant No. 4**   Name _____

Street Address _____

County, City _____

State & Zip Code _____

Telephone Number _____

## II.    Basis for Jurisdiction:

Federal courts are courts of limited jurisdiction.  Only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount in damages is more than $75,000 is a diversity of citizenship case.

A.    What is the basis for federal court jurisdiction?  *(check all that apply)*

☒ Federal Questions              ☐ Diversity of Citizenship

B.    If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory or treaty right is at issue? _Labor Management relations Act of 1947_
_Stat. 154, 29 U.S.C § 173 (d), NLRA, 29 U.S.C.§§_
_157-159 Section 7; Section 9.(A), Hybrid 301, 185 [29 u.s.c]_

C.    If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?

Plaintiff(s) state(s) of citizenship _____

Defendant(s) state(s) of citizenship _____

_____

## III.    Statement of Claim:

State as briefly as possible the _facts_ of your case.   Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events.

You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A.    Where did the events giving rise to your claim(s) occur? NYC DCAS Contract and various city sites

B.    What date and approximate time did the events giving rise to your claim(s) occur? ON or about August 15th or 19th of year 2010

C.    Facts: See Notes.

What happened to you?

Provide The E-Mail From NYC DCAS that says I committed a misconduct, immoral or criminal Act. Anything of poor performance From DCAS. that states what misconduct and poor performance.

Who did what?

Was anyone else involved?

DONNA Leak, Cynthia Tompkins, Allen pastures, Earl Forsythe, Anthony Ferguson, AJA Gonzalez, Robert Gonzalez, Javon Scott.

Who else saw what happened?

IV.    Injuries:

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received. Emotional Distress, Mental anguish, Financially. Mental Health issues.

Rev. 05/2010

Facts:

1. On or about June 30, 2010, I was laid off from a New York City Department of Education site. Based on the CBA, I Kyle Jiggetts was supposed to be recalled based on seniority.

2. AlliedBarton Security Services Breached the CBA. On or about August 15, 2010, I discovered that security guards with less seniority than myself were recalled while I was unemployed. Weeks after I was laid off, AlliedBarton Security Services, LLC hired more security guards.

3. SEIU, Local 32BJ violated the Duty of Fair Representation. I filed a grievance with the union in a timely fashion and I explained to the union rep that security guards with less seniority were recalled why I was unemployed. This was on or about August 26, 2010. Afterwards, I went to the U.S. NLRB and filed an unfair labor practice charge against my former employer and union on or about August 27, 2010.

4. The Decision by the NLRB was based
on Fraud and discrimination. on or
about october of year 2010, Board Agent,
young Lee called me on my cell Phone
and said to me that I should withdraw
my charge because NYC DCAS said that
I am Not Allowed IN any of their sites
because of Misconduct. so Far, That is
hearSAy because No evidence of misconduct
have been written against me.

5. Based on the CBA, it is inappropriate
For the court itself to draw inferences, since
such Fact Finding is the Task of the
Arbitrator which is supposed to be chosen
by the parties, Not the reviewing court.
The Arbitrator's authority is limited to
interpretation and application of Terms
contained in the agreement itself. The
court exceeded its Limited Authority to
make any decisions over a pursuant CBA
and Arbitrator. (Paperworkers v. Misco, Inc.)

6. Collective bargaining agreements commonly provide grievance procedures to settle disputes between union and employer with respect to the interpretation and application of the agreement and require binding arbitration for unsettled grievances. The Federal policy of settling labor disputes by Arbitration would be undermined if courts had the Final Say on the merits of disputes. (steel-workers v. Enterprise wheel & car corp., 363 U.S. 593, 596 (1960). An arbitrator settles disputes of based on CBA and bear its Final disposition. John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543 557 (1964). Normally, an arbitrator is authorized to disagree with the ~~Sanction~~ Sanction imposed for employee misconduct. Enterprise wheel. See paperworkers v. Misco, Inc. page 42, 484 U.S. (C)

7. ADA - Americans with Disability Act
is a Term and Provision in the CBA.
Article VIII. No Discrimination..
customer Demands. Provide the written E-mail
or any written document with info. against
me of misconduct. Not because I Participated
in a Legal Process with another contractor
which had Nothing to do with the CBA. That
is discrimination. Misconduct means bad behavior,
like a criminal act or an immoral act.

8. The ADA Title 42 - The Public Health and
welfare. Equal opportunity for individuals
with Disabilities. Page 10. You only ~~tra~~
need a record of disability and you have
Plenty of documents From me.

**V.    Relief:**

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking, and the basis for such compensation. _$ 500,000 . Five_
_hundred Thousand dollars , I have mental_
_health issues. and I was evicted from my_
_residence and I'm still suffering prestly_
_because the court never resolved these_
_claims ._

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this _27_ day of _September_ , 20 _13_

Signature of Plaintiff      _Kyle Juggetts_

Mailing Address      _2377 Tiebout Avenue_
_Bronx , NY 10458_

Telephone Number      _1-917- 631-0763_

Fax Number *(if you have one)* _____

**Note:**   All plaintiffs named in the caption of the complaint must date and sign the complaint.  Prisoners must also provide their inmate numbers, present place of confinement, and address.

**For Prisoners:**

I declare under penalty of perjury that on this _____ day of _____, 20__, I am delivering this complaint to prison authorities to be mailed to the *Pro Se* Office of the United States District Court for the Southern District of New York.

Signature of Plaintiff:   _____

Inmate Number      _____

*Rev. 05/2010*

# <u>NEW YORK CITY</u>

# <u>COLLECTIVE BARGAINING AGREEMENT</u>

## MADE BETWEEN THE FOLLOWING PARTIES:

## SECURITAS SECURITY SERVICES USA, INC.

## ALLIEDBARTON SECURITY SERVICES LLC

## AND

## SERVICE EMPLOYEES INTERNATIONAL UNION

## LOCAL 32BJ

**EFFECTIVE**
**JULY 1, 2008**

**THROUGH**
**JUNE 30, 2012**

## AGREEMENT

This Agreement, entered into as of the 23rd, December , 2008, is by and between SECURITAS SERVICES INTERNATIONAL USA, INC. and ALLIEDBARTON SECURITY SERVICES LLC (individually "Employer" and collectively "Employers"), and SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 32BJ ("Union").

## ARTICLE I:
## RECOGNITION

1.     This Agreement shall apply to all locations at which the Union is currently recognized as the exclusive collective bargaining representative of the Employers' employees, and to such other locations as agreed to by the Parties, and shall further apply to the Employers' regular full-time and part-time security officer employees working in the following New York State counties: New York, Kings, Queens, Bronx, and Richmond, but excluding all administrative and clerical, professional, confidential, seasonal, non-guard employees, supervisors and managerial personnel as defined in the National Labor Relations Act

2.     Notwithstanding the provisions contained in this Agreement, the Employers may hire and/or engage security personnel to perform specialized functions such as, but not limited to, canine patrols, armed guards, and/or general security staff related to short-term events for a period up to and including 60 days, without such personnel being covered by the terms of this Agreement.

3.     Every 30 days, the Employers shall immediately notify the Union in writing of the name and home address of each new employee engaged by the Employers subject to this Agreement and shall provide wage rates for each such employee.  The Union shall have the right to request and inspect relevant employment records for all employees at accounts where the Employer has recognized the Union.  Said information shall include but not limited to social security numbers and home addresses for employees.   Production of said employment records shall not be unreasonably withheld.

4.     If the Employer acquires an account during the life of this Agreement, where the Union was the recognized bargaining agent for security employees, the Employer shall, (1) offer

2

than the 20th day of each and every month. The Union will furnish to the Employer the necessary authorization forms.

If the Employer fails to deduct or remit the Union dues or other monies referenced in Art. 3.1 above by the 45th day from the date the monies should have been withheld and remitted, the Employer shall pay interest on such dues on the rate of 1% per month beginning on the 46th day, unless the Employer can demonstrate that delay was for good cause due to circumstances beyond its control.

2.    **Automatic Renewal.**   If an employee does not revoke his or her dues check-off authorization at the end of the year following the date of authorization, or at the end of the current contract, whichever is earlier, the employee shall be deemed to have renewed his or her authorization for another year, or until the expiration of the next succeeding contract, whichever is earlier.

3.    **Indemnification.**   The Union shall indemnify and save the Employer harmless against any/all claims, demands, suits, or other forms of liability that shall arise out of, or by reason of, action taken or not taken by the Employer for the purpose of complying with any of the provisions of this Article.

## ARTICLE IV:
## DISCIPLINE AND DISCHARGE

1.    **Just Cause.**   Employees may not be discharged or disciplined, except for just cause. Upon request of the Union, the Employer shall give the Union a written statement of the general grounds for discharge or suspension within a reasonable time, not to exceed 10 business days after the discharge or suspension.

2.    **Probation.**   Employees shall have a trial or probationary period of 120 days, during which they may be discharged or disciplined without recourse to the grievance and arbitration procedure set forth in Art. 25 *infra*.

3.    **Customer Care.**   The Union recognizes that the customer is the ultimate consumer and ultimately controls, not only employee access, but also the Employer's business.  When a security-related incident occurs on a job site that is or can be reasonably construed as injurious to that customer – the employee, the Union, and the employer will cooperate in every way in the

or locations. Upon written notice from the Employer requesting the Union to cease engaging in such publicity activities, the Union shall cease such activities for 45 days, or for any shorter period that may be agreed to by the Joint Committee. At all other accounts, the Union agrees that demonstrations or leafleting activities shall not be designed to interfere with the business relationships of the Employer but rather shall only focus on terms and conditions of Employment.

2.   **Officer Duties.**   The Union acknowledges that security officers' duties may include apprehension, identification, reporting, and evidence submission of/against any persons who perform or conduct themselves in violation of work rules or applicable laws, while on the Employer's or the customer's premises, and that the performance of such duties shall not subject security officers to punishment, discipline, or charges by the Union.

## ARTICLE VII:
## MANAGEMENT RIGHTS

1.   **Rights.**   Subject to the terms of this Agreement, the Employer shall have the exclusive right to manage and direct the workforce covered by this Agreement.  Among the exclusive rights of the management (but not intended as a wholly inclusive list of them) are: the right to plan, direct, and control all operations performed at the various locations served by the Employer; to direct and schedule the workforce; to determine the methods, procedures, equipment, operations, and/or services utilized and/or provided, or to discontinue their performance by the employees; to transfer or relocate any/all of the business operation to any location, to subcontract but only consistent with express client mandates and needs and not for the purpose of evading the obligations of this Agreement, discontinue operations by sale or otherwise, in whole or in part at any time; to establish, increase, or decrease the number of work shifts, and to determine the shift starting and ending times, as well as determine the employees' work duties; to require performance of duties other than those normally assigned; to select supervisory employees; to train employees; to discontinue, reorganize, or combine any part of the organization; to promote and demote employees, consistent with the operational needs of the business; to discipline, suspend, and discharge for just cause; to relieve employees from duty for lack of work, or any other legitimate reason; to cease acting as a contractor at any location or

the wage rate and benefits previously enjoyed by the employee.   When informed of the possibility of layoff under this paragraph, the employee shall have ten (10) days in which to notify the Employer if he or she wishes to accept a position with the Employer at another location. Nothing herein shall require the Employer to place an employee in a position for which the employee is not qualified.

5.     **Reductions.**   The Employer shall promptly notify the Union, where possible in advance, of any reductions in the number of employees assigned to any work location.

## ARTICLE VIII:
## NO DISCRIMINATION

There shall be no discrimination against any employee by reason of race, creed, color, age, sexual orientation, national origin, sex, union membership, or against a qualified individual with a disability (as defined by the Americans with Disabilities Act), marital or citizenship status and/or any characteristic protected by law, including but not limited to, claims made pursuant to Title VII of the Civil Rights Act, Americans with Disabilities Act, Age Discrimination in Employment Act, New York State Human Rights Law, New York City Human Rights Code, New Jersey Law Against Discrimination, or any other similar laws, rules, or regulations.   All such claims shall be subject to the grievance and arbitration procedure as the sole and exclusive remedy for violations.   Arbitrators shall apply the appropriate law in rendering decisions based on discrimination claims.

## ARTICLE IX:
## CONTRACTOR TRANSITION

1.     **Take-Over and Retention.**   When the Employer takes over the servicing of any account where the Union is the collective bargaining representative of the employees, the Employer agrees to retain all permanent employees at the facility, including those who might be on vacation or off work because of illness, injury, or authorized leaves of absence; this is provided, however, that employment is offered consistent with applicable law and the Employer's reasonable hiring and employment standards. Employees who are retained shall be credited with service at the account

prior to the takeover for purposes of determining completion of the probationary period as set forth in Article 14.2.

2.   **Customer Demands.**   If a customer demands that the incoming Employer remove an employee from continued employment at the location, the Employer shall have the right to comply with such demand, provided that the Employer shall make a good faith attempt to obtain the customer/tenant's demand in a writing or the Employer shall make a good faith attempt to obtain from the customer/tenant a good faith reason to justify such removal apart from the demand itself.  In such case, the Employer shall place such employee in accordance with Article 7.4 above.

3.   **Better Terms.**   If any employee or group of employees at any location covered by Art. 1 had in effect on the effective date of this Agreement (or date this Agreement applies to a location) terms or conditions  better than those provided for in this Agreement or other collective bargaining agreement with the Union covering the location with respect to wages, hours, sick pay, vacations, holidays, premium pay, relief periods, jury duty, or other economic or leave issues – such better terms or conditions shall be continued only for such employee(s) employed by the Employer on the effective date (or date this Agreement applies to the location), unless the Union and the Employer agree otherwise.

4.   **Cancellation and Notification.**   The Employer shall, within a reasonable amount of time not to exceed 10 business days, notify the Union in writing if the Employer receives written cancellation of a client-account (or cancellation of a specific site-account).  The Employer shall provide the Union with a list of all employees at the client-account site, their wage rates, the number of hours worked, the dates of hire, the number of sick days used, the number of holidays worked or taken as time off, benefit contributions made for employees, and vacation benefits.

## ARTICLE X:
## SENIORITY

1.   **Definition.**   Seniority shall be defined as an employee's length of service with the employer or at the facility, whichever is greater, regardless of whether there was a Collective Bargaining Agreement covering the facility.

2.   **Date.**   After completion of the trial or probationary period, an employee shall attain

9

seniority as of his/her original date of employment.

3. **Broken.** Seniority shall be broken by any of the following events:

    a.    resignation, retirement, or voluntary termination;

    b.    discharge for cause;

    c.    voluntary promotion into any non-bargaining unit position, unless an employee returns to the bargaining unit within six (6) months of the promotion, in which case the employee's seniority will be fully restored, less any time spent in the non-bargaining unit position;

    d.    inactive employment for any reason exceeding six months, or an employee's length of seniority, whichever is less; or,

    e.    failure to return to work after any leave within three (3) calendar days after a scheduled date for return, unless prior written notice is received by the Employer.

4. **Seniority Determinative.** Assignments, promotions, the filling of vacancies, layoffs, and recalls shall be determined on the basis of seniority, provided that – in the sole and exclusive opinion of the Employer – the employee is qualified, suitable, and available to work. Seniority shall be determinative only when all other job-related factors are equal.

5. **No Bumping.** An employee who is laid-off shall not be permitted to bump a less senior employee at another facility, but shall be permitted to obtain a vacant position at another location/site consistent with the provisions of Art. 10.4 *infra*. The Employer will give first consideration to filling vacancies to employees on a recall list. Employees may remain on the recall list for three months.

6. **Involuntary Transfers.** In the event an Employer temporarily or permanently assigns an employee to other sites covered by this Agreement for non-economic reasons or in the event of a reduction of hours at a client site, said transfer shall not be arbitrary or capricious and the employee(s) transferred shall receive those terms and conditions applicable to the site to which he or she is transferred. In assigning or transferring employees in accordance with this paragraph, the Employer shall in good faith attempt to transfer or assign the employee to a position of like or similar terms and conditions, except in no case shall said transfer cause an employee to lose his or her health care benefits.

weekly or biweekly), and the number of days after the end of the pay period within which the employee must be paid. Employees shall receive pay statements itemizing hours worked, rates of pay, and any deductions from their pay.

## ARTICLE XIII:
## WAGES

1. **Wage Increases, Generally.** The following wage tables will govern the minimum wages and wage increases for all accounts, following this Agreement's effective date, except those subject to rider agreements and the terms of rider agreements shall continue to apply for employees subject to said riders for the duration of their respective terms. Wage increases or minimum rates shall not apply retroactively at any location where the Union is recognized as the bargaining representative after the effective date of this Agreement. Employees at locations covered by expired Collective Bargaining Agreements, entered into by signatories to this Agreement, shall receive a payment, as described in Art. 13.2 (see infra).

   a. **NYC Recognized; Future NYC Class A, 250,000 + square feet.** The following wage minimums and increases will apply to all existing recognized units in New York County, irrespective of building/client-account site square footage; this wage plan will also apply to any future accounts in Class A buildings with 250,000 or more square feet of space, acquired after the date on which this Agreement goes into effect. Employees shall receive the increase or the minimum rate of pay, whichever shall result in the higher rate of pay, as follows:

| DATE | WAGE INCREASE | MINIMUM |
|------|------|------|
| 1/1/09 | .45 ¢ | $ 10.00 |
| 7/1/09 | .45 ¢ | $ 11.00 |
| 7/1/10 | .55 ¢ | $ 11.50 |
| 7/1/11 | .55 ¢ | $ 12.25 |

   b. **Outer Borough Recognized; Future Class A, less than 250,000 square feet; All Other Buildings.** The following wage minimums and increases will apply to

    c. Memorial Day

    d. Independence Day (July 4)

    e. Labor Day

    f. Thanksgiving Day

    g. Christmas Eve (December 24)

    h. Christmas Day (December 25)

    i. Presidents Day

1.   **Date.** Except as specified above, the date of each such holiday shall be deemed to be the date upon which it is officially celebrated.

2.   **Paid Days Off.** As of January 1, 2010, employees who have worked for the Employer for one year or more shall be granted one paid day off during that calendar year. As of January 1, 2011, employees who have worked for the Employer for two years or more, as of that date, will receive two paid days off during that year. Employees will be paid according to their applicable wage rate, for paid days off described herein.

3.   **Pyramiding.** Payment of eight hours of holiday allowance, as provided in this Art. 14, shall not count as time worked for the purpose of computing overtime in the given workweek. There shall be no pyramiding of overtime.

## ARTICLE XV:
## JURY DUTY

1.   **Jury Duty.** Employees shall receive leave and wages for days served performing jury duty, pursuant to applicable laws.

## ARTICLE XVI:
## SICK LEAVE

1.   **In General.** Sick leave benefits shall be paid to full-time employees who have completed 36 months of service, at the full-time employee's current wage rate then in effect at the time of illness, up to a maximum of two work days, in 2009, two work days in 2010, 3 work days in 2011, and five work days in 2012. Such pay will commence only with the second

## ARTICLE XVIII:
## UNIFORMS

1. **Supply.** The Employer shall provide and maintain appropriate uniforms and equipment to the employees without cost to the employee. The term maintain does not include cleaning unless cleaning is paid for by the client/customer.

    a. **Return.** All uniforms and other equipment furnished by the Employer shall be returned at the time of termination of employment.

## ARTICLE XIX:
## VACATION

1. **Schedule.** Following one year of employment, all regularly scheduled full-time employees shall be eligible to receive paid vacation leave under the schedule below:

    a. **Years of Service**

| Years of Service | Vacation Leave Entitlement |
| --- | --- |
| i. 1 year, but less than 3 | 1 week |
| ii. 3 years, but less than 5 | 2 weeks |
| iii. 5 years, but less than 15 | 3 weeks |
| iv. 15 years, but less than 25 | 4 weeks |
| v. 25 years or more | 5 weeks |

"Week" refers to the employee's regularly scheduled workweek, not inclusive of overtime.

2. **Pay.** Vacations shall be paid at the employee's regular straight-time hourly rate of pay.

3. **Credit.** Time-off work credited as paid vacation leave shall count as hours worked, for purposes of determining eligibility for vacation leave under this provision.

4. **Discretion.** The actual time of taking any vacation leave shall be subject to the Employer's reasonable discretion, so that the normal flow of operations will not be impeded.

5. **Unused Leave.** In the event that the service of an employee is terminated, whether voluntarily or involuntarily, the employee shall receive vacation pay for any unused vacation leave that the employee earned at the time of termination.

6. **Return From Vacation.** An employee returning from approved vacation shall be

16

## ARTICLE XXII:
## PROVISIONS APPLICABLE TO ALL FUNDS

If the Employer fails to make required reports or payments to the Funds, the Trustees may take necessary action including, but not limited to, immediate arbitration and suits at law, to enforce such reports and payments, together with interest and liquidated damages as provided in the Funds' Trust Agreement, as well as any and all collection expenses including, but not limited to, counsel fees, arbitration costs and fees, court costs, auditor's fees, and interest.

## ARTICLE XXIII:
## MOST FAVORED NATIONS

1.  **Term Adoption.** In the event the Employer takes over servicing any facility covered by this Agreement, from another employer who is party to an agreement with the Union covering the security officers at such facility, the Employer shall apply this Agreement at the facility, except that if the economic terms in effect at the facility are more favorable to the Employer than this Agreement, then the Employer may adopt the economic terms in effect at the facility, even if those terms differ from those contained in this Agreement.

    a.  When the Employer submits a bid to provide security services at a facility within the scope of Article 1 of this Agreement, and competes directly against another employer who is party to an agreement with the Union covering security officers, the Union shall, upon the written request of the Employer, provide copies of such agreement(s) to the Employer, provided the economic terms of the agreement differ from those under this Agreement.

2.  **Prior Better Conditions.** The Union shall not enter into any agreement with another employer, that covers exclusively security officers, that does not contain an equivalent clause found in Art. 9.3 *supra* (prior better conditions). In the event the Union does enter into another agreement that does not contain such a provision, the Employer shall be relieved of its obligations under Art. 9.3 *supra*.

18

grievance.   The grievance will state a summary of the facts, the specific portion of the Agreement allegedly violated, and the date the alleged violation occurred.

4.   **Procedure.**

    a.   **STEP 1.**   The Employer and the Union shall hold a meeting on unresolved grievances no later than 18 business days after the filing of the written grievance.   The meeting shall be held on a mutually agreeable date, following the request for a meeting by the Union.

    b.   **STEP 2.**   If the grievance was not settled under the above procedure, the Union may submit the grievance for arbitration, by written notice to the Employer's representative within 14 business days after the "Step 1 meeting" or, if no meeting is held, within 7 business days after the 18 business days referred to in Step 1.

    c.   **STEP 3.**   For purposes of this Grievance and Arbitration Procedure, the Union and the Employer will establish a panel of permanent, mutually agreed upon arbitrators.   At the commencement of each calendar year, the Employer and the Union shall meet to determine whether the list of arbitrators who served for the previous year will be retained for the subsequent year.   If there is not such mutual agreement, the parties shall select a new panel of arbitrators which may be comprised of arbitrators from the previous panel(s).   As of the date of this Agreement, the panel arbitrators are Noel Berman, Stephen Bluth, Howard C. Edelman, Robert Herzog, Gary Kendellen, Earl Pfeffer and David Reilly.   The parties' use of the arbitrators shall rotate to prevent one arbitrator being assigned consecutive cases.

5.   **Time Limits.**   Any grievance shall be considered withdrawn with prejudice if not filed and processed by the Union, in strict accordance with the time limitations set forth above, unless time limits are extended or waived by mutual agreement.   The Employer's failure to act within the time limit set forth in any step shall entitle the Union to proceed to the next step of the grievance procedure.   For good cause shown extension of time limits shall be permitted.

6.   **Award.**   The award of such arbitrator shall be in writing and shall be final and binding upon the Employer, the Union, and the employee or employees involved.   The arbitrator shall consider and decide only the particular issues submitted to the arbitrator.   The arbitrator's decision shall be based solely upon an interpretation of the provisions of this Agreement.   The arbitrator shall not have the right to amend, take away, modify, add to, change, or disregard any of the provisions of this Agreement.   The costs of the arbitration shall be shared equally between the parties.   Under no circumstance does the Union consent to the recording of a transcript of the

## ARTICLE XXVII:
## COMPLETE AGREEMENT AND WAIVER

The Parties acknowledge that, during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements reached by the Parties after the exercise of that right and opportunity are set forth in this Agreement.  Therefore, the Employers and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waive the right.  Each agrees that the other shall not be obligated to bargain collectively, with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subjects or matters may have been within the knowledge or contemplation of any or all Parties at the time they negotiated or signed this Agreement, except as required by law.

## ARTICLE XXVII:
## DURATION

This Agreement shall become effective on January 1, 2009, and shall remain in full force and effect through June 30, 2012.

Written notice regarding a parties intent to modify or terminate the Agreement, must be provided to the other Parties at least 60, but no more than 90, calendar days prior to the expiration date of the Agreement.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

SEIU/32BJ:  Kevin Doyle      _____      _____

AlliedBarton: Larry Loesch      _____      _____

Securitas:    Thomas Houck      _____      _____

22

seniority as of his/her original date of employment.

3. **Broken.** Seniority shall be broken by any of the following events:

    a.    resignation, retirement, or voluntary termination;

    b.    discharge for cause;

    c.    voluntary promotion into any non-bargaining unit position, unless an employee returns to the bargaining unit within six (6) months of the promotion, in which case the employee's seniority will be fully restored, less any time spent in the non-bargaining unit position;

    d.    inactive employment for any reason exceeding six months, or an employee's length of seniority, whichever is less; or,

    e.    failure to return to work after any leave within three (3) calendar days after a scheduled date for return, unless prior written notice is received by the Employer.

4. **Seniority Determinative.** Assignments, promotions, the filling of vacancies, layoffs, and recalls shall be determined on the basis of seniority, provided that – in the sole and exclusive opinion of the Employer – the employee is qualified, suitable, and available to work. Seniority shall be determinative only when all other job-related factors are equal.

5. **No Bumping.** An employee who is laid-off shall not be permitted to bump a less senior employee at another facility, but shall be permitted to obtain a vacant position at another location/site consistent with the provisions of Art. 10.4 *infra*. The Employer will give first consideration to filling vacancies to employees on a recall list. Employees may remain on the recall list for three months.

6. **Involuntary Transfers.** In the event an Employer temporarily or permanently assigns an employee to other sites covered by this Agreement for non-economic reasons or in the event of a reduction of hours at a client site, said transfer shall not be arbitrary or capricious and the employee(s) transferred shall receive those terms and conditions applicable to the site to which he or she is transferred. In assigning or transferring employees in accordance with this paragraph, the Employer shall in good faith attempt to transfer or assign the employee to a position of like or similar terms and conditions, except in no case shall said transfer cause an employee to lose his or her health care benefits.

July 2, 2009

RIDER

Between

AlliedBarton Security Services ("ABSS")
and

Local 32BJ SEIU

covering

City of New York Locations

With respect to City of New York locations covered by AlliedBarton's agreement with N.Y.C. Department of Citywide Administrative Services ("DCAS") or any subsequent service contract with the City of New York ("CNY"), the Parties adopt the provisions contained in their New York City Collective Bargaining Agreement (the "NYC Agreement"), except as modified below:

1. **Article X Seniority:** delete definition in paragraph one and replace with the following:

   Seniority shall be the employee's hire date with ABSS, or date on which continuous employment at a CNY account commenced, whichever is greater, as set forth in an agreed upon seniority list.

2. **Article XI Workweek/Overtime:** add the following:

   Employees shall be paid at the rate of time and one-half (1½) for all hours worked in excess of eight (8) hours each day to the extent required by New York Labor Law Section 232.

3. **Article XIII Wages:** delete and replace with the following:

   A. Through June 30, 2009, ABSS shall comply with the prevailing wage and benefits rates set by the New York City Office of the Comptroller for the period July 1, 2008 – June 30, 2009.

   Through June 30, 2009, there shall be two (2) basic classifications of Security Officers:  Security Officer Level I and Security Officer Level II.  The determination as to whether an Employee is classified as either a Security Officer Level I or Security Officer Level II will depend upon whether the Employee has met the qualifications set forth the DCAS contract with the Employer and the existence of an opening/vacancy within the Security Officer Level II classification as directed by the City of New York.

      1. Employees classified at Security Officer Level I shall be paid at the rate of $11.35 per hour.

1

Exibit - F



# INTEGRATED UNION ADMINISTRATION SYSTEM

*Version: 2.0.3*

Main Menu | Logout

## SEIU LOCAL 32BJ COMPLAINT FORM

LIST   EDIT

EVENTS | NOTES | MEMBER | EMPLOYER | WORK LOCATION/CONTRACT | CLAIMS | REMEDIES | COMPLAINT FORM | LETTERS

| | | |
|---|---|---|
| DATE FILED: **12/02/2010** | DIVISION: | COMPLAINT #: **360662** |

| | |
|---|---|
| MEMBER NAME: **JIGGETTS, KYLE** | MEMBER ID: **0000398066** MEMBER SSN: **\*\*\*-\*\*-0377** |
| MEMBER ADDR: **1595 UNION PORT ROAD** | MEMBER HOME: MEMBER CELL: **(347)436-6619** |
| **APT 9D** | CALL TIME: **AM-Morning** CALL TIME: **AM-Morning** |
| **BRONX NY 10462** | EMAIL: |

| | |
|---|---|
| EMPLOYER: **ALLIED BARTON SECURITY SERVICES, LLC (ABSS)** ASSOCIATION: | |
| WORK LOCATION: **501 COURTLAND AVENUE** | CONTRACT: |
| | RIDER/ASSENT: **Y** |
| GRIEVANCE EMPLOYER: **ALLIED BARTON SECURITY SERVICES, LLC (ABSS)** | |
| GRIEVANCE ADDR: **99 MADISON AVENUE, 15TH FLOOR** | |
| **NEW YORK NY 10016** | |

| | | | |
|---|---|---|---|
| OCCUPATION: **Security Officer** | SHIFT: **Day** | | |
| TIME IN INDUSTRY: **4 Years** | TIME AT WORK LOCATION: **26 Months** | TIME WITH EMPLOYER: **4 Years** | |
| LANGUAGE SPOKEN: | TRANSLATION NEEDED: | | |

NATURE OF CLAIM:

**RIF3 –  Member states that the Employer refuses to recall him from layoff effective July 1, 2010.**

**I understand that I am required to inform the 32BJ Grievance Center in writing of a change in my address or telephone and cell numbers.  I realize that a failure to do this may result in my claim being dismissed, heard or settled without me being present.**

*Kyle Jiggetts*

MEMBER SIGNATURE

**12-2-10**

DATE

| | | | | | |
|---|---|---|---|---|---|
| GRIEVANCE REP: | **LaShawn Henry** | PHONE: | **(212)388-3387** | FAX: | **(212)388-3952** |
| GRIEVANCE CENTER PHONE: | **(212)388-3388** | | | INTAKE BY: | **ew** |

$Exhibit-D$



**SERVICE EMPLOYEES**
**INTERNATIONAL UNION**
CTW, CLC

**MICHAEL P. FISHMAN**
President

**KEVIN J. DOYLE**
Executive Vice President

**HÉCTOR J. FIGUEROA**
Secretary-Treasurer

**KYLE BRAGG**
Vice President

**LENORE FRIEDLAENDER**
Vice President

**BRIAN LAMBERT**
Vice President

**VALARIE LONG**
Vice President

**Online at**
www.seiu32BJ.org

**Local 32BJ Headquarters**
101 Avenue of the Americas
New York, NY 10013-1991
212.388.3800

**Connecticut District**
800.228.5253
Hartford 860.560.8674
Stamford 203.602.6615

**Westchester District**
914.637.7000

**Long Island District**
516.579.4020

**New Jersey District**
866.5JANITOR
973.824.3225

**Philadelphia District**
215.226.3600

**District 82**
Washington 202.387.3211
Baltimore 410.225.7511
Silver Spring 301.562.9301

August 27, 2010

**VIA EMAIL AND VIA U.S. MAIL**

AlliedBarton Security Services
99 Madison Avenue, 15th Floor
New York, NY 10016
Attn: Laura Gift, Director of Human Resources
Email: laura.gift@alliedbarton.com

> Re:   501 Courtland Avenue
>        Kyle Jiggetts
>        Case No. 315432

To Whom It May Concern:

Please be advised that a dispute has arisen under the collective bargaining agreement between SEIU Local 32BJ and ALLIED BARTON SECURITY SERVICES regarding Kyle Jiggetts.

The dispute is as follows:

Claim #1:  Member claims he has been laid off and workers with less seniority have been given work at other locations, in violation of Article X of the collective bargaining agreement.  The Union seeks that the member be placed at a work site and made whole for any losses.

If you have any questions, please feel free to contact LaShawn Henry, at 212-388-3387.

Sincerely,

Dan Wilson
Complaint and Arbitration Coordinator
212-388-3103

cc:    LaShawn Henry, Grievance Representative
        Kyle Jiggetts, 1595 Union Port Road, #9D, Bronx, NY 10462

*Exibit-B*

## AFFIDAVIT OF KYLE JIGGETTS

I, was employed by AlliedBarton Security Services and I was laid off on June 30, 2010. I found out that several Security Guards from the Department of Education where I last worked was recalled even when they had less seniority than myself. A young lady with the last name Kelly Javon Scott and others from the Department of Education were recalled.

AlliedBarton Security Services were also hiring more Security Guards while I was unemployed during the months of July, August and September of year 2010. There were open schedules throughout the boroughs of New York City. I could have been floating from different sites because Security guards were taking days off for vacations or to take care of personal business. Local 32BJ, SEIU has a list of new hires and the New York City Office of the Comptroller has a list of all employees of the contractor AlliedBarton Security Services.

I was told by AlliedBarton manager Miranda Van Uden on July of 2010 that she was going to place me in a DCAS site but DCAS officer Maria Colon Ortiz would remove me. She also said that if something else opens up, she will call me. They were hiring and recalling guards with less seniority than myself. AlliedBarton Security Services arbitrarily discriminated against me in bad faith by breaching the CBA.

Date: February 27, 2012

_Kyle Jiggetts_
(Print)

_Kyle Jiggetts_
(sign)

Sworn before me on
this 28th day of February 2012

SHAWNISE TYLER
Notary Public, State of New York
Qualified in New York County
No. 01TY6142550

## DECLARATION OF KYLE JIGGETTS

**I, Kyle Jiggetts declare under penalty of perjury that the foregoing is true and correct.**

On or about August 27, 2010 I filed an unfair labor practice charge against Local 32BJ, SEIU and AlliedBarton Security Services with the U.S. National Labor Relations Board. The CBA was violated concerning layoff and recall based on seniority.

I received a call from Board Agent Young Lee on or around October of year 2010. He stated to me that AlliedBarton Security Services and Local 32BJ, SEIU admitted and said that there were employees with less seniority that were recalled back to work and I should have been recalled before them. Board Agent Young Lee then said that the City didn't want me to work at DCAS sites because it was said that I was banned from DCAS sites because of misconduct. He also said that Local 32BJ, SEIU and Allied-Barton Security Services did not violate the contract because it was the City that don't want you back.

This is a false allegation because, DCAS Deputy Commissioner Mike Siciliano admitted in a deposition 09.CV.7931 – AKH Donna Leak v. AlliedBarton Security Services, New York City Department of Citywide Administrative Services that I never had a non-performance which is misconduct while I worked as a Security Guard with AlliedBarton or Tristar in any DCAS sites. Upon me going to the office of AlliedBarton Security Services Laura Gift of H.R. said that I was on a ban list and the City did not want me working in any of their sites. This was on or about November of year 2006, the start of the contract.

I also told Laura Gift that Maria Colon Ortiz a DCAS officer said that I cannot work at 280 Broadway because I sued her and DCAS. This was on or about February or March of year 2008. I was removed from 280 Broadway because of what Maria Colon Ortiz said about the law suit not non-performance or misconduct. I charge Local 32BJ, SEIU for breach of CBA and not representing me and I charge AlliedBarton for arbitrarily discriminating against me in bad faith as both breached the CBA. Local 32BJ, SEIU Rep. Lashawn Henry never called my voice mail or wrote me about the merit of my charge.
February 27, 2012

_Kyle Jiggetts_
(Print)

_Kyle Jiggetts_
(Sign)

## DECLARATION OF KYLE JIGGETTS

I, Kyle Jiggetts declare under penalty of perjury that the foregoing is true and correct.

RE:  SEIU, Local 32BJ and AlliedBarton Security Services.

## CHRONOLOGY

1.     On or about February of year 2008, I Kyle Jiggetts was placed at 280 Broadway at the DCAS site.  The supervisor, Joe Bascillio told me that Maria Colon Ortiz a DCAS officer told him that Kyle Jiggetts can't work there because I sued her and DCAS.  I called AlliedBarton's Security Services director of Human Resources named Laura Gift and told her what was said to me and Laura Gift said to me that she must satisfy the client.  I was removed from 280 Broadway.  I was only there for about 2 weeks.  I was not removed because of an infraction or poor performance. That was the only DCAS site I worked at while employed with AlliedBarton Security Services.

2.     On June 30, 2010 I was laid-off.  On or around late July of year 2010, Javon Scott called me and asked me was I getting unemployment.  I told him I had certified but the unemploy-ment didn't start yet.  Javon Scott is one of two security guards who worked with me at 501 Courtlandt Avenue in the Bronx.  I have seniority over him.

3.     Javon Scott called me on or about August 15th of 2010 and said to me that AlliedBarton Account Manager Jeff Bermudez placed him on a Department of Transportation site in the Bronx.  Jeff Bermudez was the Account Manager for 501 Courtlandt Avenue also.

4.     On August 27, 2010, I went to Local 32BJ,SEIU located at 101 Avenue of the Americas, New York, NY 10013.  I filed a grievance concerning recall and seniority based on the Collective Bargaining Agreement and after that, I filed an unfair labor practice charge with the National Labor Relations Board against  AlliedBarton and Local 32BJ,SEIU.

5.     I told the grievance representative about Javon Scott and Jeff Bermudez concerning recall based on the CBA.  He took the grievance and the NLRB took my charge also.

6.     Several months later the U.S. National Labor Relations Board investigator said to me on the phone th  t AlliedBarton and Local32BJ, SEIU made claims that I was banned from DCAS from all sites and because this action was from the City there was nothing that was done by the union and the employer that violated the CBA.  I never got nothing from AlliedBarton or Local

32BJ,SEIU in writing as to what the infraction or what policies I violated because there are none and if there were I would have seen it. A lawyer cannot deny disclosures and discoverable evidence from their clients or the opposing party. (ABA)

7.      On or about July of 2010, I received a call from AlliedBarton's manager Miranda Van Uden and she asked me to come into the office and speak to her about work. When I spoke with her she said to me that they wanted to put me at a DCAS site but DCAS Officer Maria Ortiz Colon would have me removed. I never was called for work since then.

On or around March of year 2008, Account Manager Jennifer Sokora said to me that Maria Ortiz Colon said that I did something very bad at a DCAS site and it was when I used to work for Tristar Patrol Service, Inc. I never saw evidence of such allegations.

## CONCLUSION

There is no evidence that I did anything wrong while I worked in DCAS. AllliedBarton Security Services and Local 32BJ,SEIU used this lie and false allegation to breach the Collective Bargaining Agreement and arbitrarily, discriminated and in bad faith not process the grievance procedure and go to arbitration. I do not work for DCAS I worked for AlliedBarton. DCAS cannot give me a poor performance evaluation and whatever I did while employed with Tristar Patrol Services, Inc. has nothing to do with the Collective Bargaining Agreement between SEIU, Local 32BJ and AlliedBarton and the employees. Both defendants made false allegations to the NLRB.

Dated:   October 21, 2011

_Kyle Jiggetts_
(sign)

_Kyle Jiggetts_
(print)

1595 Unionport Road apt. 9D
Bronx, N.Y. 10462



NEW YORK STATE
DEPARTMENT OF LABOR
PO BOX 15130
ALBANY NY 12212-5130

# UNEMPLOYMENT INSURANCE
# Monetary Benefit Determination

| | |
|---|---|
| Date Mailed: | 07/12/10 |
| Social Security #: | 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 |
| Claim Effective / Start Date: | 06/28/10 |
| Benefit Year Ending Date: | 07/03/11 |
| Weekly Benefit Rate: | $260.00 |

If the address to the right is not your current address, please call 888-209-8124, or if out of state call 877-358-5306.

KYLE JIGGETS
PO BOX 286
BRONX NY 10462

### Keep This Notice For Your Records.

**Why am I receiving this notice?**

This is a notification of the employment and earnings information we have on file for you in the State of New York.

Our records indicate that you meet the earnings requirement to qualify for Unemployment Insurance Benefits. If you are approved, you will receive the Weekly Benefit Rate noted above. If not approved, you will receive a separate written notice.

Continue to claim benefits for each week in which you are unemployed by selecting one of the following options:

- Access the internet at www.labor.state.ny.us;
- Call Tel-Service at 1-888-581-5812

**Basic Base Period**

Your Basic Base Period is: **January 01, 2009** Through **December 31, 2009**

Review the breakdown below of employers and earnings that we currently have on file.

| EMPLOYER NAME | Basic Base QUARTER 01/01 - 03/31 2009 | Basic Base QUARTER 04/01 - 06/30 2009 | Basic Base QUARTER 07/01 - 09/30 2009 | Basic Base QUARTER 10/01 - 12/31 2009 | Alternate QUARTER 01/01 - 03/31 2010 | TOTAL BASE PERIOD WAGES |
|---|---|---|---|---|---|---|
| ALLIED BARTON SECURITY | 5130.20 | 4660.00 | 1846.80 | 6784.00 | 5382.00 | 18421.00 |
| TOTAL BASIC BASE PERIOD WAGES | 5130.20 | 4660.00 | 1846.80 | 6784.00 | | 18421.00 |

**How was my Weekly Benefit Rate calculated?**

Note: If you wish to use any wages which may appear in the Alternate Quarter you must complete and return form entitled "request for Alternative Base period" (see Claimant Handbook)

Your Weekly Benefit Rate was calculated using your high quarter wages from above.

| | |
|---|---|
| High Quarter Wages = $ 6,784.00 divided by 26 = $ 260.92* | $ 260.00 |
| Less Pension Reduction | - 0.00 |
| Less Worker's Compensation Reduction | - 0.00 |
| Total Net Weekly Benefit Rate | $ 260.00 |

* All calculated Weekly Benefit Rates are in whole dollars.
* The Maximum Gross Benefit Rate for the State of New York is $405.00.

**What is the maximum amount of benefits I can receive?**

Although your claim lasts one year (your benefit year), during that time you can only receive up to 26 times your Total Net Weekly Benefit Rate.

### Is all your wage information reported correctly? If not, see the enclosed Appendix for assistance.



For questions about this notice, call 888-209-8124 or if out of state call 877-358-5306



For additional information visit our website www.labor.state.ny.us



For assistance, review your Claimant's Handbook

T402B    (6-06)



# PARKCHESTER
PRESERVATION MANAGEMENT LLC
2000 East Tremont Avenue, Bronx, NY 10462
Phone: 718-536-2000 • Fax: 718-319-8109

February 29, 2012

Re:   Donna Leak
      1595 Unionport Road 9D
      Bronx, NY 10462-1595

To Whom It May Concern:

Please be advised, on February 29, 2012 Parkchester Preservation Management took legal possession of your apartment. However, if $9,864.78 is paid by March 30, 2012, you will be reinstated in the above referenced apartment. If arrears are not paid in full on said date, all items must be removed by March 30, 2012. Otherwise all items will be discarded by the landlord on April 2, 2012, and you will be billed for this service.

Signature: _Donna Leak_

Date: _2/29/12_

# MARSHAL'S LEGAL POSSESSION

Civil Court of the City of New York

County of Bronx

Index Number 71831    20 10

---

**Landlord**

Parkchester Preservation Co L.P.

against

Donna Leak
1595 Unionport Road
Apt 9D

TENANT
UNDERTENANT
ADDRESS

CITY OF NEW YORK
OFFICE OF THE CITY MARSHAL
29 East 233rd Street    Bronx, NY 10470
Tel: (718) 654 – 3000



JOHN L. VILLANUEVA, Marshal

## The Landlord has legal possession of these premises.

## For information, contact Landlord or Agent immediately.

2-29-12

**JOHN L. VILLANUEVA**
Marshal, City of New York
N.B. Any one who defaces this legal
notice or causes same to be defaced
in any way is guilty of a misde-
meanor and will be punished to the
full extent of the law.



# PARKCHESTER
### PRESERVATION MANAGEMENT LLC
2000 East Tremont Avenue, Bronx, NY 10462
Phone: 718-319-8043 • Fax: 718-319-8112

## TENANT VERIFICATION

**To Whom It May Concern:**

**Date:**   06/01/11

**Pursuant to your request, please note that our records indicate that:**

**Tenant:**   <u>DONNA LEAK</u>

**Co-Tenant**

**Occupied(s):**   **Apartment:**   <u>09D</u>   **Address:**   <u>1595 UNIONPORT ROAD</u>

**Inital Occupance Date:**   <u>01/20/06</u>

**Current Rent:**   <u>$991.46</u>

**Current Lease Terms:**   <u>02/01/11</u> - <u>01/31/12</u>

**Occupants:**

**LEASE HOLDER**
DONNA LEAK

**OCCUPANT**
KYLE JIGGETTS

Sincerely,

Renting Associate

*Reference #: 10383*

Case 1:13-cv-05353-PAE Document 28 Filed 10/08/13 Page 34 of 71
Case 1:11-cv-04667-LTS-MHD Document 9 Filed 08/02/11 Page 24 of 36
Case 1:11-cv-04667-LTS-MHD Document 1 Filed 07/06/11 Page 15 of 27



**32BJ**

**SEIU**

*Stronger Together*

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

**MICHAEL P. FISHMAN**
President

**KEVIN J. DOYLE**
Executive Vice President

**HÉCTOR J. FIGUEROA**
Secretary-Treasurer

**KYLE BRAGG**
Vice President

**LENORE FRIEDLAENDER**
Vice President

**BRIAN LAMBERT**
Vice President

**VALARIE LONG**
Vice President

**Online at**
www.seiu32BJ.org

**Local 32BJ Headquarters**
101 Avenue of the Americas
New York, NY 10013-1991
212.388.3800

**Connecticut District**
800.228.5253
Hartford 860.560.8674
Stamford 203.602.6615

**Westchester District**
914.637.7000

**Long Island District**
516.579.4020

**New Jersey District**
866.5JANITOR
973.824.3225

**Philadelphia District**
215.226.3600

**District 82**
Washington 202.387.3211
Baltimore 410.225.7511
Silver Spring 301.562.9301

October 7, 2010

**VIA EMAIL AND VIA U.S. MAIL**

AlliedBarton Security Services
99 Madison Avenue, 15th Floor
New York, NY 10016
Attn: Laura Gift, Director of Human Resources
Email: laura.gift@alliedbarton.com

> Re: 501 Courtland Avenue
> Kyle Jiggetts
> Case No. 315432

Dear Ms. Gift:

SEIU Local 32BJ and AlliedBarton Security Services are signatory to a collective bargaining agreement which provides that in the event of disputes, the matter shall be referred a rotating panel of arbitrators chosen by the parties.

Since the parties have been unable to resolve the dispute concerning the following claims, we submit this grievance for arbitration pursuant to Article XXV of the collective bargaining agreement.

The dispute is as follows:

Claim #1: Member claims he has been laid off and workers with less seniority have been given work at other locations, in violation of Article X of the collective bargaining agreement. The Union seeks that the member be placed at a work site and made whole for any losses.

A copy of the Union's grievance letter is attached for reference.

Very truly yours,

Dan Wilson
Complaint and Arbitration Coordinator

cc: LaShawn Henry, Grievance Representative, SEIU Local 32BJ
Kyle Jiggetts, 1595 Union Port Road, #9D, Bronx, NY 10462

Case 1:13-cv-05353-PAE  Document 28  Filed 10/08/13  Page 35 of 71
Case 1:11-cv-04667-LTS -MHD  Document 9  Filed 08/02/11  Page 26 of 33
Case 1:11-cv-04667-LTS -MHD  Document 1  Filed 07/06/11  Page 17 of 27

SEIU-32BJ | IUAS

Page 1 of 1

 **INTEGRATED UNION ADMINISTRATION SYSTEM**

Version: 1.3.1

Main Menu | Logout

**SEIU LOCAL 32BJ COMPLAINT FORM**

LIST EDIT

EVENTS | NOTES | MEMBER | EMPLOYER | WORK LOCATION/CONTRACT | CLAIMS | REMEDIES | COMPLAINT FORM | LETTERS

| | | |
|---|---|---|
| **DATE FILED: 08/26/2010** | **DIVISION:** Security | **COMPLAINT #: 315432** |
| **MEMBER NAME: JIGGETTS, KYLE** | **MEMBER ID:** 0000398066 | **MEMBER SSN: ***-**-0377** |
| **MEMBER ADDR: 1595 Union Port Road** | **MEMBER HOME:** | **MEMBER CELL: (347)436-6619** |
| Apt 9D | **CALL TIME:** AM-Morning | **CALL TIME:** AM-Morning |
| BRONX NY 10462 | **EMAIL:** | |

| | | | |
|---|---|---|---|
| **WORK LOCATION:** 501 COURTLAND AVENUE | **OWNER:** | | |
| | **CONTRACT:** | | |
| **EMPLOYER:** ALLIED BARTON SECURITY SERVICES, LLC (ABSS) | | | |
| **EMPLOYER ADDR:** 99 MADISON AVENUE, 15TH FLOOR | | | |
| NEW YORK NY 10016 | | | |
| **OCCUPATION:** Security Officer | **SHIFT:** Day | | |
| **TIME IN INDUSTRY:** 12 Years | **TIME AT WORK LOCATION:** 4 Years | **TIME WITH EMPLOYER:** 4 Years | |
| **LANGUAGE SPOKEN:** | **TRANSLATION NEEDED:** No | | |

**NATURE OF CLAIM:**

CV3 - Member claims he has been laid of, and workers with less seniority have been given work at other locations.

I understand that I am required to inform the 32BJ Grievance Center in writing of a change in my address or telephone and cell numbers. I realize that a failure to do this may result in my claim being dismissed, heard or settled without me being present.

*Kyle Jiggetts*
MEMBER SIGNATURE:

8/26/10
DATE

| | | | | |
|---|---|---|---|---|
| **GRIEVANCE REP:** LaShawn Henry | **PHONE:** (212)388-3387 | **FAX:** (212)388-3952 | | |
| **GRIEVANCE CENTER PHONE:** (212)388-3388 | | **INTAKE BY:** fm | | |

Case 1:13-cv-05253-PAE  Document 28  Filed 03/01/18  Page 25 of 33
Case 1:11-cv-04667-LTS-MHD  Document 9  Filed 03/06/13  Page 25 of 71
Case 1:11-cv-04667-LTS-MHD  Document 1  Filed 07/06/11  Page 16 of 27



August 27, 2010

<u>VIA EMAIL AND VIA U.S. MAIL</u>

AlliedBarton Security Services
99 Madison Avenue, 15th Floor
New York, NY 10016
Attn: Laura Gift, Director of Human Resources
Email: laura.gift@alliedbarton.com

Re:   **501 Courtland Avenue**
      **Kyle Jiggetts**
      **Case No. 315432**

**SERVICE EMPLOYEES INTERNATIONAL UNION**
CTW, CLC

**MICHAEL P. FISHMAN**
President

**KEVIN J. DOYLE**
Executive Vice President

**HÉCTOR J. FIGUEROA**
Secretary-Treasurer

**KYLE BRAGG**
Vice President

**LENORE FRIEDLAENDER**
Vice President

**BRIAN LAMBERT**
Vice President

**VALARIE LONG**
Vice President

**Online at**
www.seiu32BJ.org

**Local 32BJ Headquarters**
101 Avenue of the Americas
New York, NY 10013-1991
212.388.3800

**Connecticut District**
900.228.5253
Hartford 860.560.8674
Stamford 203.602.6615

**Westchester District**
914.637.7000

**Long Island District**
516.579.4020

**New Jersey District**
866.5.JANITOR
973.824.3225

**Philadelphia District**
215.226.3600

**District 82**
Washington 202.387.3211
Baltimore 410.225.7511
Silver Spring 301.562.9301

To Whom It May Concern:

Please be advised that a dispute has arisen under the collective bargaining agreement between SEIU Local 32BJ and ALLIED BARTON SECURITY SERVICES regarding Kyle Jiggetts.

The dispute is as follows:

**Claim #1:**  Member claims he has been laid off and workers with less seniority have been given work at other locations, in violation of Article X of the collective bargaining agreement.  The Union seeks that the member be placed at a work site and made whole for any losses.

If you have any questions, please feel free to contact LaShawn Henry, at 212-388-3387.

Sincerely,

Dan Wilson
Complaint and Arbitration Coordinator
212-388-3103

cc:   LaShawn Henry, Grievance Representative
      Kyle Jiggetts, 1595 Union Port Road, #9D, Bronx, NY 10462

28

OCTOBER TERM, 1987

Opinion of the Court

484 U. S.

to exploit that knowledge or information for his own personal benefit but must account to his principal for any profits derived therefrom." *Diamond* v. *Oreamuno,* 24 N. Y. 2d 494, 497, 248 N. E. 2d 910, 912 (1969); see also Restatement (Second) of Agency §§ 388, Comment c, 396(c) (1958).

We have little trouble in holding that the conspiracy here to trade on the Journal's confidential information is not outside the reach of the mail and wire fraud statutes, provided the other elements of the offenses are satisfied. The Journal's business information that it intended to be kept confidential was its property; the declaration to that effect in the employee manual merely removed any doubts on that score and made the finding of specific intent to defraud that much easier. Winans continued in the employ of the Journal, appropriating its confidential business information for his own use, all the while pretending to perform his duty of safeguarding it. In fact, he told his editors twice about leaks of confidential information not related to the stock-trading scheme, 612 F. Supp., at 831, demonstrating both his knowledge that the Journal viewed information concerning the "Heard" column as confidential and his deceit as he played the role of a loyal employee. Furthermore, the District Court's conclusion that each of the petitioners acted with the required specific intent to defraud is strongly supported by the evidence. *Id.,* at 847-850.

Lastly, we reject the submission that using the mail to print and send the Journal to its customers did not satisfy the requirement that those mediums be used to execute the scheme at issue. The courts below were quite right in observing that circulation of the "Heard" column was not only anticipated but an essential part of the scheme. Had the column not been made available to Journal customers, there would have been no effect on stock prices and no likelihood of profiting from the information leaked by Winans.

The judgment below is

*Affirmed.*

PAPERWORKERS v. MISCO, INC.

Syllabus

UNITED PAPERWORKERS INTERNATIONAL UNION, AFL-CIO, ET AL. v. MISCO, INC.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 86-651.  Argued October 13, 1987—Decided December 1, 1987

Respondent employer's collective-bargaining agreement with petitioner union authorizes the submission to binding arbitration of any grievance that arises from the interpretation or application of the agreement's terms, and reserves to management the right to establish, amend, and enforce rules regulating employee discharge and discipline and setting forth disciplinary procedures. One of respondent's rules listed as causes for discharge the possession or use of controlled substances on company property. Isiah Cooper, an employee covered by the agreement, who operated a hazardous machine, was apprehended by police in the backseat of someone else's car in respondent's parking lot with marijuana smoke in the air and a lighted marijuana cigarette in the frontseat ashtray. A police search of Cooper's own car on the lot revealed marijuana gleanings. Upon learning of the cigarette incident, respondent discharged Cooper for violation of the disciplinary rule. Cooper then filed a grievance which proceeded to arbitration on the stipulated issue whether respondent had just cause for the discharge under the rule and, if not, the appropriate remedy. The arbitrator upheld the grievance and ordered Cooper's reinstatement, finding that the cigarette incident was insufficient proof that Cooper was using or possessed marijuana on company property. Because, at the time of the discharge, respondent was not aware of, and thus did not rely upon, the fact that marijuana had been found in Cooper's own car, the arbitrator refused to accept this fact into evidence. However, the District Court vacated the arbitration award and the Court of Appeals affirmed, ruling that reinstatement would violate the public policy "against the operation of dangerous machinery by persons under the influence of drugs." The court held that the cigarette incident and the finding of marijuana in Cooper's car established a violation of the disciplinary rule that gave respondent just cause for discharge.

*Held:*

1. The Court of Appeals exceeded the limited authority possessed by a court reviewing an arbitrator's award entered pursuant to a collective-bargaining agreement.  Pp. 36-42.

29

(a) Absent fraud by the parties or the arbitrator's dishonesty, reviewing courts in such cases are not authorized to reconsider the merits of the award, since this would undermine the federal policy of privately settling labor disputes by arbitration without governmental intervention. The parties having agreed to submit all questions of contract interpretation to the arbitrator, the reviewing court is confined to ascertaining whether the award draws its essence from the contract and does not simply reflect the arbitrator's own notions of industrial justice. As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the court cannot overturn his decision simply because it disagrees with his factual findings, contract interpretations, or choice of remedies. Pp. 36-38.

(b) The Court of Appeals was not free to refuse enforcement of the award simply because it considered the cigarette incident ample proof that the disciplinary rule had been violated, since no dishonesty is alleged here, and since improvident factfinding is hardly a sufficient basis for disregarding what the arbitrator appointed by the parties determined to be the historical facts. Nor is the arbitrator's refusal to consider the evidence of marijuana in Cooper's car a sufficient basis for nonenforcement, since the collective-bargaining agreement largely left evidentiary matters to the arbitrator, whose decision on this point was consistent with the practice followed by other arbitrators of refusing to admit evidence which a discharging party did not rely upon. Assuming that the arbitrator did err on this point, his error was not in bad faith or so gross as to amount to affirmative misconduct. Moreover, his decision not to consider the disputed evidence did not forever foreclose respondent use of that evidence as a basis for discharge. Even if it were open to the court to find a disciplinary rule violation on the basis of that evidence, the court could not properly set aside the award because in its view discharge was the correct remedy, since arbitrators normally have discretion in formulating remedies. Although the agreement here may have limited the arbitrator's remedial discretion by giving respondent the unreviewable right to discharge violators of the disciplinary rule, the proper course would have been remand to the arbitrator for a definitive construction of the contract in this respect. Pp. 39-42.

(c) The Court of Appeals erred in setting aside the arbitral award on public policy grounds. A court's refusal to enforce an arbitrator's interpretation of a collective-bargaining agreement is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." W. R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 766. An alleged public policy must be properly

framed under the approach set out in W. R. Grace, and the violation of such policy must be clearly shown. Here, the court made no attempt to review existing laws and legal precedents, but simply formulated a policy against the operation of dangerous machinery under the influence of drugs based on "general considerations of supposed public interests." Even if that formulation could be accepted, no violation of the policy was clearly shown, since the assumed connection between the marijuana gleanings in Cooper's car and its actual use of drugs in the workplace is tenuous at best. It was inappropriate for the court itself to draw that inference, since factfinding is the task of the arbitrator chosen by the parties, not the reviewing court. Furthermore, the award ordered Cooper's reinstatement in his old job or an equivalent one for which he was qualified, and it is not clear that he would pose a threat to the asserted public policy in every such alternative job. Pp. 42-46.

768 F. 2d 739, reversed.

WHITE, J., delivered the opinion for a unanimous Court. BLACKMUN, J., filed a concurring opinion, in which BRENNAN, J., joined, post, p. 46.

David Silberman argued the cause for petitioners. With him on the briefs were Lynn Agee, Michael Gottesman, and Laurence Gold.

A. Richard Gear argued the cause and filed a brief for respondent.*

JUSTICE WHITE delivered the opinion of the Court.

The issue for decision involves several aspects of when a federal court may refuse to enforce an arbitration award rendered under a collective-bargaining agreement.

I

Misco, Inc. (Misco, or the Company), operates a paper converting plant in Monroe, Louisiana. The Company is a party to a collective-bargaining agreement with the United Paperworkers International Union, AFL-CIO, and its union local (the Union); the agreement covers the production and main-

*David E. Feller and William P. Murphy filed a brief for the National Academy of Arbitrators as amicus curiae urging reversal.

Philip A. Lacovara and William P. Stein filed a brief for Northwest Airlines, Inc., et al. as amici curiae urging affirmance.

tenance employees at the plant. Under the agreement, the Company or the Union may submit to arbitration any grievance that arises from the interpretation or application of its terms, and the arbitrator's decision is final and binding upon the parties. The arbitrator's authority is limited to interpretation and application of the terms contained in the agreement itself. The agreement reserves to management the right to establish, amend, and enforce "rules and regulations regulating the discipline or discharge of employees" and the procedures for imposing discipline. Such rules were to be posted and were to be in effect "until ruled on by grievance and arbitration procedures as to fairness and necessity."[1] For about a decade, the Company's rules had listed as causes for discharge the bringing of intoxicants, narcotics, or controlled substances on to plant property or consuming any of them there, as well as reporting for work under the influence of such substances.[2] At the time of the events involved in this case, the Company was very concerned about the use of drugs at the plant, especially among employees on the night shift.

Isiah Cooper, who worked on the night shift for Misco, was one of the employees covered by the collective-bargaining agreement. He operated a slitter-rewinder machine, which uses sharp blades to cut rolling coils of paper. The arbitrator found that this machine is hazardous and had caused numerous injuries in recent years. Cooper had been reprimanded twice in a few months for deficient performance.

---

[1] App. 20–21. The language quoted is from Article XI of the agreement, which concerns maintenance of discipline. Article VI of the agreement sets out the arbitration procedure. Id., at 18–20. The reserved rights of management are specified in Article IV of the agreement. Id., at 13–15.

[2] Rule II.1 lists the following as causes for discharge: "Bringing intoxicants, narcotics, or controlled substances into, or consuming intoxicants, narcotics or controlled substances in the plant, or on plant premises. Reporting for duty under the influence of intoxicants, narcotics, or controlled substances." App. to Pet. for Cert. 31a.

On January 21, 1983, one day after the second reprimand, the police searched Cooper's house pursuant to a warrant, and a substantial amount of marijuana was found. Contemporaneously, a police officer was detailed to keep Cooper's car under observation at the Company's parking lot. At about 6:30 p.m., Cooper was seen walking in the parking lot during work hours with two other men. The three men entered Cooper's car momentarily, then walked to another car, a white Cutlass, and entered it. After the other two men later returned to the plant, Cooper was apprehended by police in the backseat of this car with marijuana smoke in the air and a lighted marijuana cigarette in the frontseat ashtray. The police also searched Cooper's car and found a plastic scales case and marijuana gleanings. Cooper was arrested and charged with marijuana possession.[3]

On January 24, Cooper told the Company that he had been arrested for possession of marijuana at his home; the Company did not learn of the marijuana cigarette in the white Cutlass until January 27. It then investigated and on February 7 discharged Cooper, asserting that in the circumstances, his presence in the Cutlass violated the rule against having drugs on the plant premises.[4] Cooper filed a grievance protesting his discharge the same day, and the matter proceeded to arbitration. The Company was not aware until September 21, five days before the arbitration hearing was scheduled, that marijuana had been found in Cooper's car. That fact did not become known to the Union until the hearing began. At the hearing it was stipulated that the issue was whether the Company had "just cause to discharge

---

[3] Cooper later pleaded guilty to that charge, which was not related to his being in a car with a lighted marijuana cigarette in it. The authorities chose not to prosecute for the latter incident.

[4] "The Company asserted that being in a car with a lit marijuana cigarette was a direct violation of the company rule against having an illegal substance on company property." App. 23.

the Grievant under Rule 11.1" and, "[i]f not, what if any should be the remedy." App. to Pet. for Cert. 26a.

The arbitrator upheld the grievance and ordered the Company to reinstate Cooper with backpay and full seniority. The arbitrator based his finding that there was not just cause for the discharge on his consideration of seven criteria.[5] In particular, the arbitrator found that the Company failed to prove that the employee had possessed or used marijuana on company property: finding Cooper in the backseat of a car and a burning cigarette in the frontseat ashtray was insufficient proof that Cooper was using or possessed marijuana on company property. Id., at 49a–50a. The arbitrator refused to accept into evidence the fact that marijuana had been found in Cooper's car on company premises because the Company did not know of this fact when Cooper was discharged and therefore did not rely on it as a basis for the discharge.[6]

The Company filed suit in District Court, seeking to vacate the arbitration award on several grounds, one of which was that ordering reinstatement of Cooper, who had allegedly possessed marijuana on the plant premises, was contrary to public policy. The District Court agreed that the award must be set aside as contrary to public policy because it ran

---

[5] These considerations were the reasonableness of the employer's position, the notice given to the employee, the timing of the investigation undertaken, the fairness of the investigation, the evidence against the employee, the possibility of discrimination, and the relation of the degree of discipline to the nature of the offense and the employee's past record.

[6] The arbitrator stated: "One of the rules in arbitration is that the Company must have its proof in hand before it takes disciplinary action against an employee. The Company does not take the disciplinary action and then spend eight months digging up supporting evidence to justify its actions. In addition, the use of the gleanings evidence prevented the Grievant from knowing the full extent of the charge against him. Who knows what action the Grievant or the Union would have taken if the gleanings evidence had been made known from the outset of the Company's investigation." App. to Pet. for Cert. 47a.

counter to general safety concerns that arise from the operation of dangerous machinery while under the influence of drugs, as well as to state criminal laws against drug possession. The court ruled that reinstatement would violate the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d 739, 743 (CA5 1985). The arbitrator had found that Cooper was apprehended on company premises in an atmosphere of marijuana smoke in another's car and that marijuana was found in his own car on the company lot. These facts established that Cooper had violated the Company's rules and gave the Company just cause to discharge him. The arbitrator did not reach this conclusion because of a "narrow focus on Cooper's procedural rights" that led him to ignore what he "knew was in fact true: that Cooper did bring marijuana onto his employer's premises." Ibid. Even if the arbitrator had not known of this fact at the time he entered his award, "it is doubtful that the award should be enforced today in light of what is now known." Ibid.

Because the Courts of Appeals are divided on the question of when courts may set aside arbitration awards as contravening public policy,[7] we granted the Union's petition for a writ of certiorari, 479 U. S. 1029 (1987), and now reverse the judgment of the Court of Appeals.

---

[7] The decision below accords with the broader view of the courts' power taken by the First and Seventh Circuits. See, e. g., United States Postal Service v. American Postal Workers Union, AFL–CIO, 736 F. 2d 822 (CA1 1984); E. I. DuPont de Nemours and Co. v. Grasselli Employees Independent Assn. of East Chicago, Inc., 790 F. 2d 611 (CA7), cert. denied, 479 U. S. 853 (1986). A narrower view has been taken by the Ninth and District of Columbia Circuits. See, e. g., Bevles Co. v. Teamsters Local 986, 791 F. 2d 1391 (CA9 1986); Northwest Airlines, Inc. v. Air Line Pilots Assn. International, 257 U. S. App. D. C. 181, 808 F. 2d 76 (1987); American Postal Workers Union v. United States Postal Service, 252 U. S. App. D. C. 169, 789 F. 2d 1 (1986).

## II

The Union asserts that an arbitral award may not be set aside on public policy grounds unless the award orders conduct that violates the positive law, which is not the case here. But in the alternative, it submits that even if it is wrong in this regard, the Court of Appeals otherwise exceeded the limited authority that it had to review an arbitrator's award entered pursuant to a collective-bargaining agreement. Respondent, on the other hand, defends the public policy decision of the Court of Appeals but alternatively argues that the judgment below should be affirmed because of erroneous findings by the arbitrator. We deal first with the opposing alternative arguments.

### A

Collective-bargaining agreements commonly provide grievance procedures to settle disputes between union and employer with respect to the interpretation and application of the agreement and require binding arbitration for unsettled grievances. In such cases, and this is such a case, the Court made clear almost 30 years ago that the courts play only a limited role when asked to review the decision of an arbitrator. The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593, 596 (1960). As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate. *Id.,* at 597.

"The function of the court is very limited when the parties have agreed to submit all questions of contract inter-

pretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

"The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *Steelworkers* v. *American Mfg. Co.,* 363 U. S. 564, 567–568 (1960) (emphasis added; footnote omitted).

See also *AT&T Technologies, Inc.* v. *Communications Workers,* 475 U. S. 643, 649–650 (1986).

The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations. These statutes reflect a decided preference for private settlement of labor disputes without the intervention of government: The Labor Management Relations Act of 1947, 61 Stat. 154, 29 U. S. C. § 173(d), provides that "[f]inal adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." See also *AT&T Technologies, supra,* at 650. The courts have jurisdiction to enforce collective-bargaining contracts; but where the contract provides grievance and arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute. Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the mean-

ing of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract. *Enterprise Wheel, supra*, at 599. So, too, where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect. If the courts were free to intervene on these grounds, the speedy resolution of grievances by private mechanisms would be greatly undermined. Furthermore, it must be remembered that grievance and arbitration procedures are part and parcel of the ongoing process of collective bargaining. It is through these processes that the supplementary rules of the plant are established. As the Court has said, the arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision. Of course, decisions procured by the parties through fraud or through the arbitrator's dishonesty need not be enforced. But there is nothing of that sort involved in this case.

The Company's position, simply put, is that the arbitrator committed grievous error in finding that the evidence was insufficient to prove that Cooper had possessed or used marijuana on company property. But the Court of Appeals, although it took a distinctly jaundiced view of the arbitrator's decision in this regard, was not free to refuse enforcement because it considered Cooper's presence in the white Cutlass, in the circumstances, to be ample proof that Rule II.1 was violated. No dishonesty is alleged; only improvident, even silly, factfinding is claimed. This is hardly a sufficient basis for disregarding what the agent appointed by the parties determined to be the historical facts.

Nor was it open to the Court of Appeals to refuse to enforce the award because the arbitrator, in deciding whether there was just cause to discharge, refused to consider evidence unknown to the Company at the time Cooper was fired. The parties bargained for arbitration to settle disputes and were free to set the procedural rules for arbitrators to follow if they chose. Article VI of the agreement, entitled "Arbitration Procedure," did set some ground rules for the arbitration process. It forbade the arbitrator to consider hearsay evidence, for example, but evidentiary matters were otherwise left to the arbitrator. App. 19. Here the arbitrator ruled that in determining whether Cooper had violated Rule II.1, he should not consider evidence not relied on by the employer in ordering the discharge, particularly in a case like this where there was no notice to the employee or the Union prior to the hearing that the Company would attempt to rely on after-discovered evidence. This, in effect, was a construction of what the contract required when deciding discharge cases: an arbitrator was to look only at the evidence before the employer at the time of discharge. As the arbitrator noted, this approach was consistent with the prac-

tice followed by other arbitrators[8] And it was consistent with our observation in *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 557 (1964), that when the subject matter of a dispute is arbitrable, "procedural" questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator.

Under the Arbitration Act, the federal courts are empowered to set aside arbitration awards on such grounds only when "the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U. S. C. § 10(c). *See Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U. S. 145 (1968).[9] If we apply that same standard here and assume that the arbitrator erred in refusing to consider the disputed evidence, his error was not in bad faith or so gross as to amount to affirmative misconduct.[10] Finally, it is worth noting that put-

---

[8] "Labor arbitrators have stated that the correctness of a discharge "must stand or fall upon the reason given at the time of discharge," see, e. g., *West Va. Pulp & Paper Co.,* 10 Lab. Arb. 117, 118 (1947), and arbitrators often, but not always, confine their considerations to the facts known to the employer at the time of the discharge. O. Fairweather, Practice and Procedure in Labor Arbitration 303–306 (2d ed. 1983); F. Elkouri & E. Elkouri, How Arbitration Works 684–685 (3d ed. 1973).

[9] The Arbitration Act does not apply to "contracts of employment of . . . workers engaged in foreign or interstate commerce," 9 U. S. C. § 1, but the federal courts have often looked to the Act for guidance in labor arbitration cases, especially in the wake of the holding that § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185, empowers the federal courts to fashion rules of federal common law to govern "[s]uits for violation of contracts between an employer and a labor organization" under the federal labor laws. *Textile Workers v. Lincoln Mills,* 353 U. S. 448 (1957) (construing 29 U. S. C. § 185). See, e. g., *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F. 2d 1123 (CA3 1969); *Pietro Scalzitti Co. v. International Union of Operating Engineers, Local No. 150,* 351 F. 2d 576 (CA7 1965).

[10] "Even in the very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result, since this step would improp-

ting aside the evidence about the marijuana found in Cooper's car during this arbitration did not forever foreclose the Company from using that evidence as the basis for a discharge.

Even if it were open to the Court of Appeals to have found a violation of Rule II.1 because of the marijuana found in Cooper's car, the question remains whether the court could properly set aside the award because in its view discharge was the correct remedy. Normally, an arbitrator is authorized to disagree with the sanction imposed for employee misconduct. In *Enterprise Wheel,* for example, the arbitrator reduced the discipline from discharge to a 10-day suspension. The Court of Appeals refused to enforce the award, but we reversed, explaining that though the arbitrator's decision must draw its essence from the agreement, he "is to bring his informed judgment to bear in order to reach a fair solution of a problem. *This is especially true when it comes to formulating remedies.*" 363 U. S., at 597 (emphasis added). The parties, of course, may limit the discretion of the arbitrator in this respect; and it may be, as the Company argues, that under the contract involved here, it was within the unreviewable discretion of management to discharge an employee once a violation of Rule II.1 was found. But the parties stipulated that the issue before the arbitrator was whether there was "just" cause for the discharge, and the arbitrator, in the course of his opinion, cryptically observed that Rule II.1

---

erly substitute a judicial determination for the arbitrator's decision that the parties bargained for in the collective-bargaining agreement. Instead, the court should simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement. The court also has the authority to remand for further proceedings when this step seems appropriate. See, e. g., *Amalgamated Food & Allied Workers Union, Local 56 v. Great A&P Tea Co.,* 415 F. 2d 185 (CA3 1969) (vacating and remanding to the arbitrators for decision after finding that the arbitrators declined to arbitrate the issues submitted). See also 9 U. S. C. § 10(e)("Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators").

merely listed causes for discharge and did not expressly provide for immediate discharge. Before disposing of the case on the ground that Rule II.1 had been violated and discharge was therefore proper, the proper course would have been remand to the arbitrator for a definitive construction of the contract in this respect.

C

The Court of Appeals did not purport to take this course in any event. Rather, it held that the evidence of marijuana in Cooper's car required that the award be set aside because to reinstate a person who had brought drugs onto the property was contrary to the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d, at 743. We cannot affirm that judgment.

A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. *W. R. Grace & Co.* v. *Rubber Workers,* 461 U. S. 757, 766 (1983); *Hurd* v. *Hodge,* 334 U. S. 24, 34–35 (1948). That doctrine derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and is further justified by the observation that the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements. *E. g., McMullen* v. *Hoffman,* 174 U. S. 639, 654–655 (1899); *Twin City Pipe Line Co.* v. *Harding Glass Co.,* 283 U. S. 353, 356–358 (1931). In the common law of contracts, this doctrine has served as the foundation for occasional exercises of judicial power to abrogate private agreements.

In *W. R. Grace,* we recognized that "a court may not enforce a collective-bargaining agreement that is contrary to public policy," and stated that "the question of public policy is ultimately one for resolution by the courts." 461 U. S., at 766. We cautioned, however, that a court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Ibid.* (quoting *Muschany* v. *United States,* 324 U. S. 49, 66 (1945)). In *W. R. Grace,* we identified two important public policies that were potentially jeopardized by the arbitrator's interpretation of the contract: obedience to judicial orders and voluntary compliance with Title VII of the Civil Rights Act of 1964. We went on to hold that enforcement of the arbitration award in that case did not compromise either of the two public policies allegedly threatened by the award. Two points follow from our decision in *W. R. Grace.* First, a court may refuse to enforce a collective-bargaining agreement when the specific terms contained in that agreement violate public policy. Second, it is apparent that our decision in that case does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy. Although we discussed the effect of that award on two broad areas of public policy, our decision turned on our examination of whether the award created any explicit conflict with other "laws and legal precedents" rather than an assessment of "general considerations of supposed public interests." 461 U. S., at 766. At the very least, an alleged public policy must be properly framed under the approach set out in *W. R. Grace,* and the violation of such a policy must be clearly shown if an award is not to be enforced.

As we see it, the formulation of public policy set out by the Court of Appeals did not comply with the statement that such a policy must be "ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Ibid.* (quoting *Muschany* v. *United States, supra,* at 66). The Court of Appeals made no attempt to review existing laws and legal precedents in order to demonstrate that they establish a "well-defined and dominant" policy against the operation of dangerous machinery while under the influence of drugs. Although certainly such a judgment is firmly rooted in common sense, we explicitly held in *W. R. Grace* that a formulation of public policy based only on "general considerations of supposed public interests" is not the sort that permits a court to set aside an arbitration award that was entered in accordance with a valid collective-bargaining agreement.

Even if the Court of Appeals' formulation of public policy is to be accepted, no violation of that policy was clearly shown in this case. In pursuing its public policy inquiry, the Court of Appeals quite properly considered the established fact that traces of marijuana had been found in Cooper's car. Yet the assumed connection between the marijuana gleanings found in Cooper's car and Cooper's actual use of drugs in the workplace is tenuous at best and provides an insufficient basis for holding that his reinstatement would actually violate the public policy identified by the Court of Appeals "against the operation of dangerous machinery by persons under the influence of dangerous drugs or alcohol." 768 F. 2d, at 743. A refusal to enforce an award must rest on more than speculation or assumption.

In any event, it was inappropriate for the Court of Appeals itself to draw the necessary inference. To conclude from the fact that marijuana had been found in Cooper's car that Cooper had ever been or would be under the influence of marijuana while he was on the job and operating dangerous machinery is an exercise in factfinding about Cooper's use of

drugs and his amenability to discipline, a task that exceeds the authority of a court asked to overturn an arbitration award. The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe Cooper and to be familiar with the plant and its problems. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task. If additional facts were to be found, the arbitrator should find them in the course of any further effort by the Company might have made to discharge Cooper for having had marijuana in his car on company premises. Had the arbitrator found that Cooper had possessed drugs on the property, yet imposed discipline short of discharge because he found as a factual matter that Cooper could be trusted not to use them on the job, the Court of Appeals could not upset the award because of its own view that public policy about plant safety was threatened.[11] In this connection it should also be noted that the award ordered Cooper to be reinstated in his old job or in an equivalent one for which he was qualified. It is by no means clear from the record that Cooper would pose a serious threat to the asserted public policy in every job for which he was qualified.[12]

The judgment of the Court of Appeals is reversed.

*So ordered.*

---

[11] "The issue of safety in the workplace is a commonplace issue for arbitrators to consider in discharge cases, and it was a matter for the arbitrator in the first instance to decide whether Cooper's alleged use of drugs on the job would actually pose a danger. That is not a problem here, for the arbitrator recognized that being under the influence of marijuana while operating slitter-rewinder machinery was indeed dangerous, and no one disputed this point.

[12] "We need not address the Union's position that a court may refuse to enforce an award on public policy grounds only when the award itself violates a statute, regulation, or other manifestation of positive law, or compels conduct by the employer that would violate such a law.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN joins, concurring.

I join the Court's opinion, but write separately to underscore the narrow grounds on which its decision rests and to emphasize what it is *not* holding today. In particular, the Court does not reach the issue upon which certiorari was granted: whether a court may refuse to enforce an arbitration award rendered under a collective-bargaining agreement on public policy grounds only when the award itself violates positive law or requires unlawful conduct by the employer. The opinion takes no position on this issue. See *ante*, at 45, n. 12. Nor do I understand the Court to decide, more generally, in what way, if any, a court's authority to set aside an arbitration award on public policy grounds differs from its authority, outside the collective-bargaining context, to refuse to enforce a contract on public policy grounds. Those issues are left for another day.

I agree with the Court that the judgment of the Court of Appeals must be reversed, and I summarize what I understand to be the three alternative rationales for the Court's decision:

1. The Court of Appeals exceeded its authority in concluding that the company's discharge of Cooper was proper under the collective-bargaining agreement. The Court of Appeals erred in considering evidence that the arbitrator legitimately had excluded from the grievance process, in second-guessing the arbitrator's factual finding that Cooper had not violated Rule II.1, and in assessing the appropriate sanction under the agreement. See *Steelworkers v. American Mfg. Co.,* 363 U. S. 564, 567-568 (1960); *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U. S. 593, 596-597, 599 (1960). Absent its overreaching, the Court of Appeals lacked any basis for disagreeing with the arbitrator's conclusion that there was not "just cause" for discharging Cooper. See *ante*, at 39-42.

2. Even if the Court of Appeals properly considered evidence of marijuana found in Cooper's car and legitimately found a Rule II.1 violation, the public policy advanced by the Court of Appeals does not support its decision to set aside the award. The reinstatement of Cooper would not contravene the alleged public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d 739, 743 (CA5 1985). The fact that an employee's car contains marijuana gleanings does not indicate that the employee uses marijuana on the job or that he operates his machine while under the influence of drugs, let alone that he will report to work in an impaired state in the future. See *ante*, at 44. Moreover, nothing in the record suggests that the arbitrator's award, which gives the company the option of placing Cooper in a job equivalent to his old one, would require Cooper to operate hazardous machinery. See *ante*, at 44-45.

3. The public policy formulated by the Court of Appeals may not properly support a court's refusal to enforce an otherwise valid arbitration award. In *W. R. Grace & Co. v. Rubber Workers,* 461 U. S. 757 (1983), we stated that the public policy must be founded on "laws and legal precedents." *Id.,* at 766, quoting *Muschany v. United States,* 324 U. S. 49, 66 (1945). The Court of Appeals identified no law or legal precedent that demonstrated an "explicit public policy," 461 U. S., at 766, against the operation of dangerous machinery by persons under the influence of drugs. Far from being "well defined and dominant," as *W. R. Grace* prescribed, the Court of Appeals' public policy was ascertained merely "from general considerations of supposed public interests." *Ibid.* See *ante*, at 43. I do not understand the Court, by criticizing the company's public policy formulation, to suggest that proper framing of an alleged public policy under the approach set out in *W. R. Grace* would be sufficient to justify a court's refusal to enforce an arbitration award on public policy grounds. Rather, I understand the

48                    OCTOBER TERM, 1987

Court to hold that such compliance is merely a necessary step
if an award is not to be enforced.   See *ante*, at 44.

  It is on this understanding that I join the opinion of the
Court.

**OFFICE OF THE GENERAL COUNSEL**
Division of Operations-Management

MEMORANDUM OM 12-30          January 23, 2012

TO:        All Regional Directors, Officers-in-Charge,
             and Resident Officers

FROM:      Anne G. Purcell, Associate General Counsel

SUBJECT:    Cases involving Employer Mandatory Arbitration Policies
                that Interfere with Employees' Section 7 Rights

        In *D.R. Horton, Inc.*,[1] the Board held that a policy or agreement that precludes employees from filing employment-related collective or class claims against the employer, in both arbitral and judicial forums, unlawfully restricts the employees' Section 7 right to engage in concerted action for mutual aid or protection, and violates Section 8(a)(1) of the Act. In so holding, the Board expressly rejected the construction of the Act advanced in Memorandum GC 10-06, *Guideline Memorandum Concerning Unfair Labor Practice Charges Involving Employee Waivers in the Context of Employers' Mandatory Arbitration Policies* (June 16, 2010). *See 357 NLRB No. 184, slip op. at 6-7.* Accordingly, the analysis of Memorandum GC 10-06 is no longer valid, and that Memorandum should not be relied upon in any pending or future cases.

        In addition, in any case involving arbitration agreements alleged to limit employees' collective legal action, the Regional Office should contact the Division of Advice as soon as they have completed their investigation to discuss further processing of the case.

        So that we can track these cases, Regions should assign the Hot Topic of "Employer Mandatory Arbitration Policy" to these cases in NxGen.

        If a Regional Office has any questions concerning this legal issue, it may contact Advice at any time.

                                 /s/
                                 A.P.

cc:    NLRBU
Release to the Public



---

[1] 357 NLRB No. 184 (2012).

# BERRY   MOORMAN

# PUBLICATIONS

## A Short Primer on Hybrid Section 301 Claims for the Unionized Employer

**by Robert W. Morgan**
**March 2001**

⊞ SHARE

Detroit Office
(313) 496-1200

Birmingham Office
(248) 645-9680

Ann Arbor Office
(734) 668-4100

If you have employees that are represented by a union, you may have terminated an employee who is then unhappy with you for discharging him and also unhappy with his union for deciding not to pursue his grievance and/or request for arbitration. Not possessing a particularly self effacing nature (i.e. being unable to admit, or even comprehend, that he got what he deserved), the employee searches for legal counsel to right this "manifest injustice" which has befallen him.

His selected counsel is likely to be a general practitioner with little or no experience in labor law. The lawsuit will be filed in state or federal court against either you as the sole defendant or together with the union as co-defendants. The complaint will allege either wrongful discharge or breach of the collective bargaining agreement ("labor contract").

However, as long as the employee's claim is for breach of the contract and your collective bargaining agreement contains a grievance procedure capped by final and binding arbitration, this lawsuit will be governed by the provisions of § 301 of the Labor Management Relations Act ("LMRA") and over 50 years of court decisions which interpret how this federal law is applied.

### Section 301 of the LMRA

In 1947, Congress enacted the LMRA amendments to the National Labor Relations Act ("NLRA"). Among those changes was the addition of § 301 which provided that lawsuits brought to enforce the terms of labor contracts of employers engaged in interstate commerce (which includes almost all employers) could be brought in federal court without regard to the amount of money involved in the dispute or the citizenship of the parties.

In 1962, the Supreme Court decided that only federal law would apply to such suits. In essence, states are preempted from applying their own common law or statutes to such lawsuits -- as long as the state law action is based on a claim of rights or duties under a labor contract and requires an interpretation of a term contained in the labor contract for resolution of the dispute. Thus, even though it is permissible for a state court to hear a § 301 claim, it would be required to apply federal law.

The plain language of § 301 appears to contemplate such suits would be only be brought by and between employers and unions, and such suits by and between employers and unions are commonly referred to as a "straightforward § 301" claims.

## Hybrid § 301 Claims

In 1962, the Supreme Court determined that § 301 also contemplated breach of labor contract suits brought by individual employees directly against their employers. The Court limited such employee-generated suits to those based on the "uniquely personal" rights of employees covered by the labor contract such as disputes involving wages, hours, overtime pay and wrongful discharge.

Five years later and reconfirmed in numerous decisions thereafter, the Supreme Court modified its prior position on such employee-generated suits to require that the plaintiff-employee, in order to prevail against the employer, plead and prove that the union also breached its duty of fair representation by failing to represent him properly in the contractually mandated grievance/arbitration procedure. In so doing, the Court recognized long-standing federal labor policy favoring the negotiation of grievance/arbitration procedures which expedite resolution of disputes more quickly than litigation -- thereby enhancing industrial peace and stability. Further, the Court recognized that the parties who negotiated a grievance/arbitration procedure had a

right to rely both on its use and the outcome it provided

Therefore, the employee-plaintiff cannot prevail on a hybrid § 301 claim against either the employer or the union if the employee can only show that the employer violated the labor contract or the union breached its duty of fair representation. The employee-plaintiff must be able to prove both elements in order to prevail against either the employer or the union.

This modification did not require the employee to actually name the union as a defendant in his complaint -- only that the employee's complaint states, and the employee proves, that the union also breached its duty of fair representation in regard to its handling of the grievance/arbitration procedures. Whether or not the union is also a named defendant in the employee's suit, such suits are known as "hybrid § 301" claims.

## A Union's Breach of its Duty of Fair Representation

As to a union's breach of its duty of fair representation, the employee-plaintiff must prove that the union's actions tainted the grievance procedure such that the outcome was more than likely affected by the union's breach. Clearly, a union's wrongful refusal to process the employee's grievance through progressive steps or proceed to arbitration would affect the outcome. However, if the dispute has proceeded through arbitration with an unfavorable outcome to the employee, the employee's proof of such taint is much more tenuous.

In the context of a hybrid § 301 claims, an allegation that the union breached its duty of fair representation must arise from the union's handling of its employee-member's grievance and/or arbitration. The employee-plaintiff must plead and prove that the union handled his grievance arbitrarily, in a discriminatory manner or in bad faith.

While a union may not arbitrarily ignore a meritorious grievance or process the grievance in a perfunctory manner (i.e. acting in a capricious manner or without rational explanation), courts give unions a wide range of reasonableness within which to act. Unions have not been found to have breached their duty for mere negligence or poor judgment.

## Employer Reliance on Union Conduct

In 1976, the Supreme Court held that an employer may not rely on the union's conduct in fulfilling its duties pursuant a negotiated grievance/arbitration procedure. In that matter, discharged employees filed a hybrid § 301 claim even though the dispute had gone through the grievance process and been subject to final and binding arbitration. The Court found that if the union had exercised reasonable diligence in its representation of these employees, it would have uncovered conclusive exculpatory evidence which exonerated the discharged employees. Thus, the Court ruled that courts should not give preclusive effect to an arbitration award where the union's breach of its duty of fair representation "seriously undermines the integrity of the arbitral process," thereby removing "the bar of the finality provisions of the contract."

If an employer breaches the labor contract, it simply doesn't matter that the employer relied on the union doing its part because the employer's own action precipitated the dispute. Under such circumstances, the employer will be held liable for the damages caused by its actions, and the union will be liable for the rest. The same result will occur no matter when during the grievance/arbitration process the union breaches its duty -- in refusing to process a grievance in the first instance or representing the employee at arbitration in an arbitrary, discriminatory or bad faith manner.

### Apportionment of Damages in Hybrid § 301 Claims

Where a hybrid § 301 claim has been proved by the employee, liability is apportioned between the breaching employer and the breaching union according to the damages caused by the fault of each. Generally, the employer is assessed those damages which occurred prior to the union's breach of its duty of fair representation, and the union is assessed for those damages occurring after its breach.

## Statute of Limitations for Hybrid § 301 Claims

As with many other federal statutes which are silent as to an applicable statute of limitations, federal courts had universally applied the most analogous federal or state statute of limitations to § 301 claims. For instance, in 1986, the Sixth Circuit Court of Appeals (the federal circuit court which hears cases arising in Michigan) applied Tennessee's 6-year breach of contract limitations period in a § 301 suit against a Tennessee employer for failure to make required payments under its labor contract.

This borrowing of an analogous federal or state statute of limitations period still applies to straightforward § 301 claims

However, in 1983, the Supreme Court decided that the applicable statute of limitations in a hybrid § 301 claim should be derived from federal law — specifically, the 6-month limitations period provided under § 10(b) of the NLRA which governs the time in which an unfair labor practice charge can be filed with the National Labor Relations Board. In that case, an employee sued both the employer for violation of the collective bargaining agreement and his union for breach of its duty of fair representation. The Court found that the employee's hybrid § 301 claim had no close analogy in state law, but rather presented an array of interests (i.e. the need for speedy resolution of disputes to enhance industrial peace and stability) similar to those balanced by Congress in establishing the short 6-month limitations period in § 10(b) for filing unfair labor practice claims.

Since that ruling, federal circuit courts, including the Sixth Circuit, have uniformly applied a 6-month statute of limitations period to hybrid § 301 claims, regardless of whether the employee sued the employer alone or brought suit against both the employer and his union.

*August 17, 2011*

Finally, the federal courts have determined that this 6-month statute of limitations begins to run when the employee knows or reasonably should have known of his union's failure in its duty of fair representation to him.

## Conclusions and Recommendations

Due to procedural and substantive intricacies involved in hybrid § 301 claims, most experienced labor practitioners shy away from undertaking such cases for employees. However, lacking such knowledge before they proceed, general practice plaintiff attorneys will draft and file such complaints without a second thought.

While the employer's chances of defeating such claims at trial are generally very good, the cost of litigating these matters is significant. Thus, avoiding such litigation in the first instance or taking advantage of technical deficiencies in the employee's complaint to cause the case to be dismissed prior to trial is important.

Therefore, the following points should be considered:

- As to any detrimental job action to be taken against a unionized employee, double check the contractual basis for the decision to ensure compliance with your labor contract.

*No mistake or Fact Made by me*

- If a grievance is filed as a result of the job action taken by you, do not assume that the union will adequately protect the employee's interest or bring to light a mistake of fact made by you.

- If the union withdraws the grievance prior to the expiration of the grievance procedure or decides against taking the claim to arbitration, do not rely on the union to notify the employee of its decision. To ensure a quick start to running the 6-month statute of limitations, you should notify the affected employee as to the union's grievance/arbitration decision.

- Upon receipt of a complaint by a union-represented employee, determine the basis for the employee's claim. No matter how the claim is titled or described in the complaint, if the essence of the claim is your breach of the labor contract or an interpretation of a term of the labor contract is necessary to resolve the claim, then the claim will be governed by § 301.

- If the complaint sets forth a § 301 claim and has been filed in a state court, the case should be removed to the local federal district court where the judges are more familiar with the federal law and precedents involving § 301 claims.

- Check the facts to determine if the employee filed a timely grievance in this matter. If a grievance was not filed or not filed in the time permitted under the labor contract, the employee has failed to exhaust the contractually-mandated grievance/arbitration procedure and his lawsuit will generally be dismissed.

*Timely*

- Determine whether the employee filed his complaint within 6-months of the time when he knew or reasonably should have known that the union failed to represent him properly. If the case was filed after this period, his lawsuit will be dismissed.

- If the union was not also named as a defendant in the complaint, determine if the employee has alleged that his union breached its duty of fair representation. If the plaintiff has done neither, then wait for the 6-month limitations period to

expire (if it has not already expired) and move to have the case dismissed for the employee's failure to plead and prove this essential element. Once the 6-month limitation period has passed, the court will then not permit the plaintiff to amend his complaint by adding the union as a defendant and/or allege that the union breached its duty of fair representation in that such amendment would be futile based on the tolling of the statute of limitations.

If you would like further information on these matters or have questions regarding their impact on your business, please contact Robert Morgan or any other member of our Labor and Employment Law Practice Group.

Law Firm Home | Overview | Attorneys | Practices | Offices | News | Publications | Contact

535 Griswold, Suite 1900 • Detroit, Michigan 48226 • (313) 496-1200

© 2011 Berry Moorman PC  All Rights Reserved.        Sitemap | Disclaimer | Русский |

## CASES

375 U.S. 335; 84 S. Ct. 363;
"L. Ed. 2d 370, 1964 U.S."
Humphrey ET AL. V. Moore ET Al. ……………………………………...

345 U.S. 330; 73 S. Ct. 681;
97 L. Ed. 1048; 1953 U.S.
Ford Motor Co. V. Huffman ET AL. ……………………………………

National Labor Relations Act,
29 U.S.C.S. §§ 157-159
Section 7; Section 9. (a) …………………………………………………

Hybrid Section 301, 185 [29 U.S.C.S.] ……………………………………
(LMRA)

Federal Civil Rules of Evidence
Fed. R. Evid …………………………………………………………......
Fed. R. 37(a)(1)(6)(G)……………………………………………………

By allowing AlliedBarton Security Services to invoke the doctrine of claim preclusion, the defendants violated the CBA as it regards seniority, layoff and recall.

For that reason, Petitioner errs in contending          that the decision of the court of appeals conflicts with court cases based on the national Labor Relations Act and Section 301, 185 [29 U.S.C.].  Other provisions of the contract stated that it was the intention of the parties to resolve all questions of interpretation by mutual agreement and that the employer agreed to be bound by all of the terms and provisions of this agreement, and also agree to be bound by the interpretations and enforcement of the agreement.

---

pp. 368 and 379 (Pet 4.)

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organization, may be brought in any District Court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties "29 U.S.C. § 185(a). and ., Labor Board V. Local 294, International Bro. of Teamsters, 317 F. 2d 746 (C.A. 2d cir.)

# Montefiore  Behavioral Health Center

8/5/13

To whom it may concern,

Mr. Kyle Jiggetts is a patient at The Montefiore Behavioral Health Center at Westchester Square Outpatient Clinic. He was admitted to the clinic on 6/20/13 and attends individual psycho-therapy sessions every two weeks and has psychiatric appointments on a monthly basis. Patient carries a diagnosis of Major Depressive Disorder, Recurrent, Moderate 296.32 and Alcohol Dependence in Full Remission, 303.90. He is not prescribed any psychotropic medications at this time. Patient is compliant with treatment and attends his appointments on a regular basis. If you have any further questions please feel free to contact me.

Sincerely,

*Christina Albanese, LMSW*

Christina Albanese, LMSW
Social Worker 1
Montefiore Behavioral Health Center
2527 Glebe Avenue
Bronx, NY 10461
(718) 904-4467

A

TITLE 42 - THE PUBLIC HEALTH AND WELFARE

CHAPTER 126 - EQUAL OPPORTUNITY FOR INDIVIDUALS WITH DISABILITIES

Sec. 12101. Findings and purpose

   (a) Findings

The Congress finds that

   (1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;

   (2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

   (3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

   (4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

   (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

   (6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

7

(7) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and

(8) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

(b) Purpose

It is the purpose of this chapter

(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

Sec. 12101 note: Findings and Purposes of ADA Amendments Act of 2008, Pub. L. 110-325, § 2, Sept. 25, 2008, 122 Stat. 3553, provided that:

(a) Findings

Congress finds that–

(1) in enacting the Americans with Disabilities Act of 1990 (ADA), Congress intended that the Act "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and provide broad coverage;

(2) in enacting the ADA, Congress recognized that physical and mental disabilities in no way diminish a person's right to fully participate in all aspects of society, but that people with physical or mental disabilities are frequently precluded from doing so because of prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers;

**8**

(3) while Congress expected that the definition of disability under the ADA would be interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973, that expectation has not been fulfilled;

(4) the holdings of the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect;

(5) the holding of the Supreme Court in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) further narrowed the broad scope of protection intended to be afforded by the ADA;

(6) as a result of these Supreme Court cases, lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities;

(7) in particular, the Supreme Court, in the case of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), interpreted the term "substantially limits" to require a greater degree of limitation than was intended by Congress; and

(8) Congress finds that the current Equal Employment Opportunity Commission ADA regulations defining the term "substantially limits" as "significantly restricted" are inconsistent with congressional intent, by expressing too high a standard.

(b) Purposes

The purposes of this Act are–

(1) to carry out the ADA's objectives of providing "a clear and comprehensive national mandate for the elimination of discrimination" and "clear, strong, consistent, enforceable standards addressing discrimination" by reinstating a broad scope of protection to be available under the ADA;

(2) to reject the requirement enunciated by the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures;

(3) to reject the Supreme Court's reasoning in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) with regard to coverage under the third prong of the definition of disability and to reinstate the reasoning of the Supreme Court in

**9**

School Board of Nassau County v. Arline, 480 U.S. 273 (1987) which set forth a broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973;

(4) to reject the standards enunciated by the Supreme Court in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), that the terms "substantially" and "major" in the definition of disability under the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled," and that to be substantially limited in performing a major life activity under the ADA "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives";

(5) to convey congressional intent that the standard created by the Supreme Court in the case of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) for "substantially limits", and applied by lower courts in numerous decisions, has created an inappropriately high level of limitation necessary to obtain coverage under the ADA, to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis; and

(6) to express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines the term "substantially limits" as "significantly restricted" to be consistent with this Act, including the amendments made by this Act.

Sec. 12102. Definition of disability

As used in this chapter:

(1) Disability

The term "disability" means, with respect to an individual

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

(2) Major Life Activities

**10**

(A) In general

For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

(B) Major bodily functions

For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

(3) Regarded as having such an impairment

For purposes of paragraph (1)(C):

(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

(B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

(4) Rules of construction regarding the definition of disability

The definition of "disability" in paragraph (1) shall be construed in accordance with the following:

(A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

(B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

(C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

11

    (B) qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments;

    (C) acquisition or modification of equipment or devices; and

    (D) other similar services and actions.

  (2) State

The term "State" means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Virgin Islands of the United States, the Trust Territory of the Pacific Islands, and the Commonwealth of the Northern Mariana Islands.

## SUBCHAPTER I - EMPLOYMENT

Sec. 12111. Definitions

As used in this subchapter:

  (1) Commission

The term "Commission" means the Equal Employment Opportunity Commission established by section 2000e-4 of this title.

  (2) Covered entity

The term "covered entity" means an employer, employment agency, labor organization, or joint labor-management committee.

  (3) Direct threat

The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.

  (4) Employee

The term "employee" means an individual employed by an employer. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

  (5) Employer

    (A) In general

**12**

The term "employer" means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years following the effective date of this subchapter, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.

(B) Exceptions

The term "employer" does not include

(i) the United States, a corporation wholly owned by the government of the United States, or an Indian tribe; or

(ii) a bona fide private membership club (other than a labor organization) that is exempt from taxation under section 501(c) of title 26.

(6) Illegal use of drugs

(A) In general

The term "illegal use of drugs" means the use of drugs, the possession or distribution of which is unlawful under the Controlled Substances Act [21 U.S.C. 801 et seq.]. Such term does not include the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law.

(B) Drugs

The term "drug" means a controlled substance, as defined in schedules I through V of section 202 of the Controlled Substances Act [21 U.S.C. 812].

(7) Person, etc.

The terms "person", "labor organization", "employment agency", "commerce", and "industry affecting commerce", shall have the same meaning given such terms in section 2000e of this title.

(8) Qualified individual

The term "qualified individual " means an individual who, with or without reasonable accommodation, can perform the essential functions of the

**13**

employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

(9) Reasonable accommodation

The term "reasonable accommodation" may include

  (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

  (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

(10) Undue hardship

  (A) In general

  The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).

  (B) Factors to be considered

  In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include

    (i) the nature and cost of the accommodation needed under this chapter;

    (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

    (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

**14**

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

Sec. 12112. Discrimination

(a) General rule

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

(b) Construction

As used in subsection (a) of this section, the term "discriminate against a qualified individual on the basis of disability" includes

(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs);

(3) utilizing standards, criteria, or methods of administration

(A) that have the effect of discrimination on the basis of disability;

(B) that perpetuates the discrimination of others who are subject to common administrative control;

(4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association;

(5)

(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an

**15**

applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;

(6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity; and

(7) failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

(c) Covered entities in foreign countries

(1) In general

It shall not be unlawful under this section for a covered entity to take any action that constitute discrimination under this section with respect to an employee in a workplace in a foreign country if compliance with this section would cause such covered entity to violate the law of the foreign country in which such workplace is located.

(2) Control of corporation

(A) Presumption

If an employer controls a corporation whose place of incorporation is a foreign country, any practice that constitutes discrimination under this section and is engaged in by such corporation shall be presumed to be engaged in by such employer.

(B) Exception

**16**

(B) publish a list of infectious and communicable diseases which are transmitted through handling the food supply;

(C) publish the methods by which such diseases are transmitted; and

(D) widely disseminate such information regarding the list of diseases and their modes of transmissibility to the general public.

Such list shall be updated annually.

(2) Applications

In any case in which an individual has an infectious or communicable disease that is transmitted to others through the handling of food, that is included on the list developed by the Secretary of Health and Human Services under paragraph (1), and which cannot be eliminated by reasonable accommodation, a covered entity may refuse to assign or continue to assign such individual to a job involving food handling.

(3) Construction

Nothing in this chapter shall be construed to preempt, modify, or amend any State, county, or local law, ordinance, or regulation applicable to food handling which is designed to protect the public health from individuals who pose a significant risk to the health or safety of others, which cannot be eliminated by reasonable accommodation, pursuant to the list of infectious or communicable diseases and the modes of transmissibility published by the Secretary of Health and Human Services.

Sec. 12114. Illegal use of drugs and alcohol

(a) Qualified individual with a disability

For purposes of this subchapter, qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.

(b) Rules of construction

Nothing in subsection (a) of this section shall be construed to exclude as a qualified individual with a disability an individual who

(1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;

**17**

→ (2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or

→ (3) is erroneously regarded as engaging in such use, but is not engaging in such use;

except that it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs.

(c) Authority of covered entity

A covered entity

(1) may prohibit the illegal use of drugs and the use of alcohol at the workplace by all employees;

(2) may require that employees shall not be under the influence of alcohol or be engaging in the illegal use of drugs at the workplace;

(3) may require that employees behave in conformance with the requirements established under the Drug-Free Workplace Act of 1988 (41 U.S.C. 701 et seq.); 70

(4) may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee; and

(5) may, with respect to Federal regulations regarding alcohol and the illegal use of drugs, require that

(A) employees comply with the standards established in such regulations of the Department of Defense, if the employees of the covered entity are employed in an industry subject to such regulations, including complying with regulations (if any) that apply to employment in sensitive positions in such an industry, in the case of employees of the covered entity who are employed in such positions (as defined in the regulations of the Department of Defense);

(B) employees comply with the standards established in such regulations of the Nuclear Regulatory Commission, if the employees of the covered entity are employed in an industry subject to such regulations, including complying with regulations (if any) that apply to employment in sensitive positions in

**From:** Gift, Laura [Laura.Gift@alliedbarton.com]
**Sent:** Tuesday, October 05, 2010 2:44 PM
**To:** Lee, Young
**Subject:** RE: Kyle Jiggetts (2-CA-40089)

Thank you. This has been sent to our legal counsel, Martenson, Hasbrouk and Simon, LLP. They will be in contact with you.

Laura Gift
Director of Human Resources
New York City Region

**From:** Lee, Young [mailto:Young.Lee@nlrb.gov]
**Sent:** Monday, October 04, 2010 5:00 PM
**To:** Gift, Laura
**Subject:** RE: Kyle Jiggetts (2-CA-40089)

That is the strangest thing. I apologize for the confusion, but it seems blank pages were scanned. Nothing further was included within the pages.

**From:** Gift, Laura [mailto:Laura.Gift@alliedbarton.com]
**Sent:** Monday, October 04, 2010 12:21 PM
**To:** Lee, Young
**Subject:** FW: Kyle Jiggetts (2-CA-40089)

Thank you for sending this. There are a number of blank pages in the scan document – can you confirm all the printed pages are there?

Laura Gift
Director of Human Resources
New York City Region
212.277.9651  Phone
212.685.5215  Fax



Local Response    National Support

**From:** Lee, Young [mailto:Young.Lee@nlrb.gov]
**Sent:** Monday, October 04, 2010 12:16 PM
**To:** Gift, Laura
**Subject:** Kyle Jiggetts (2-CA-40089)

Ms. Gift,

Per our conversation, I am sending the charge filed by Kyle Jiggetts against Allied Barton Security Services. I would appreciate if you submitted a position statement by October 13, 2010. Also, please submit the 'recall list' that Mr. Jiggetts is placed on, because Mr. Jiggetts alleges others with less seniority were recalled before him. If you are unable to meet these deadlines, please give me a call at (212) 264-7357 or email me at this address for a short extension.

10/7/2010                                                    **27**

**Musich, Kathleen**

| | |
|---|---|
| From: | Lyle Rowen [lrowen@seiu32bj.org] |
| Sent: | Tuesday, June 28, 2011 3:02 PM |
| To: | Musich, Kathleen |
| Subject: | RE: Kyle Jiggetts (2-CB-23066) |

The Union received a copy of an email from DCAS to AlliedBarton prohibiting Jiggetts from working at any of their sites, but I don't know when exactly that was received by the Union.  I know about it because Jiggetts keeps suing us, AlliedBarton, DCAS and the City of New York in every possible forum over that email, among other perceived acts of injustice.

If the timing of when the Union received it is important, I can find out.

Thanks,
Lyle

-----Original Message-----
From: Musich, Kathleen [mailto:Kathleen.Musich@nlrb.gov]
Sent: Monday, June 27, 2011 12:43 PM
To: Lyle Rowen
Subject: RE: Kyle Jiggetts (2-CB-23066)

Lyle,

Thank you for you quick response.  When you were doing your investigation of Mr. Jiggetts grievance, did you get any written documentation from the employer regarding DCAS's ban of CP from their facilities due to CP's past misconduct?

Kindly,

Kathleen Musich, Board Agent
National Labor Relations Board, Region 2
26 Federal Plaza, Suite 3614
(Phone) 212-264-5855
(Fax) 212-264-2450
kathleen.musich@nlrb.gov

-----Original Message-----
From: Lyle Rowen [mailto:lrowen@seiu32bj.org]
Sent: Friday, June 24, 2011 3:02 PM
To: Musich, Kathleen
Subject: Kyle Jiggetts (2-CB-23066)

Kathleen,

The Union submits the following position statement in this charge:

Kyle Jiggetts, the charging party ("CP"), was employed as a security officer through Allied Barton Security Services, and assigned to an account with the NYC Department of Education.  The CP's assigned facility was closed in late June 2010 and the CP was laid off accordingly.  Under Article X, Sections 4 & 5, Allied Barton was required to place the CP on a recall list for a period of 3 months.
Allied Barton complied with that CBA obligation for just over the 90-day period, after which he was removed.

On December 2, 2010, the CP filed a complaint with Local 32BJ alleging that while he was on the recall list, other Allied Barton security officers with less seniority were recalled from the list while he was not.  The Union investigated the complaint and determined that (1) it was long time-barred under the CBA's 18-business-day filing period for contract grievances (Article XXV); and (2) the simple fact that other employees were

1

**28**

recalled over the CP does not mean that the Employer violated the CBA.  Article X, Section 4 explicitly provides for the Employer to consider other factors when recalling laid-off employees.

Moreover, the Union learned that 80% of Allied Barton's accounts in NYC (the jurisdiction of the CBA (see Article I)) are with the NYC Department of Citywide Administrative Services ("DCAS").  DCAS had previously banned the CP from working at ANY of its facilities due to the CP's misconduct during a previous assignment at a DCAS location.  The Employer has the right under Article VII to honor such requests from clients, such as DCAS.  Thus, it is entirely likely that during period the CP was on the Employer's recall list, other employees with lower seniority were recalled to other Allied Barton accounts since most of the available locations are with DCAS, from which the CP was banned.

Based on this information, the Union closed the grievance without further action.  As the CP is not currently working in covered employment, the Union no longer represents the CP in any manner.

A copy of the CBA is attached (labeled "Securitas" but it covers both Securitas and Allied Barton).

Let me know if you require any additional information.

Thanks,
Lyle

<<Securitas Master CBA.pdf>>

29

**Musich, Kathleen**

| | |
|---|---|
| **From:** | Lyle Rowen [lrowen@seiu32bj.org] |
| **Sent:** | Friday, June 24, 2011 3:02 PM |
| **To:** | Musich, Kathleen |
| **Subject:** | Kyle Jiggetts (2-CB-23066) |
| | |
| **Attachments:** | Securitas Master CBA.pdf |



Securitas Master
CBA.pdf (10 M...

Kathleen,

The Union submits the following position statement in this charge:

Kyle Jiggetts, the charging party ("CP"), was employed as a security officer through Allied Barton Security Services, and assigned to an account with the NYC Department of Education. The CP's assigned facility was closed in late June 2010 and the CP was laid off accordingly. Under Article X, Sections 4 & 5, Allied Barton was required to place the CP on a recall list for a period of 3 months.
Allied Barton complied with that CBA obligation for just over the 90-day period, after which he was removed.

On December 2, 2010, the CP filed a complaint with Local 32BJ alleging that while he was on the recall list, other Allied Barton security officers with less seniority were recalled from the list while he was not. The Union investigated the complaint and determined that (1) it was long time-barred under the CBA's 18-business-day filing period for contract grievances (Article XXV); and (2) the simple fact that other employees were recalled over the CP does not mean that the Employer violated the CBA. Article X, Section 4 explicitly provides for the Employer to consider other factors when recalling laid-off employees.

Moreover, the Union learned that 80% of Allied Barton's accounts in NYC (the jurisdiction of the CBA (see Article I)) are with the NYC Department of Citywide Administrative Services ("DCAS"). DCAS had previously banned the CP from working at ANY of its facilities due to the CP's misconduct during a previous assignment at a DCAS location. The Employer has the right under Article VII to honor such requests from clients, such as DCAS. Thus, it is entirely likely that during period the CP was on the Employer's recall list, other employees with lower seniority were recalled to other Allied Barton accounts since most of the available locations are with DCAS, from which the CP was banned.

Based on this information, the Union closed the grievance without further action. As the CP is not currently working in covered employment, the Union no longer represents the CP in any manner.

A copy of the CBA is attached (labeled "Securitas" but it covers both Securitas and Allied Barton).

Let me know if you require any additional information.

Thanks,
Lyle

<<Securitas Master CBA.pdf>>

**30**